**LOCAL 32B–32J, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, For And On Behalf Of Its Members, and Local 2, Service Employees International Union, AFL–CIO, For And On Behalf Of Its Members, Plaintiffs,**

v.

**PORT AUTHORITY OF NEW YORK AND NEW JERSEY, The Port Authority of New York and New Jersey Police, Frank B. Fox, in his capacity as Acting Superintendent of Police of The Port Authority of New York and New Jersey, Gene Ceccarelli, in his capacity as Captain of the Police of The Port Authority of New York and New Jersey, Charles**

Maikish, in his capacity as Director and Chief Executive Officer of the World Trade Center, Edwin Monteverde, in his capacity as General Manager, Tenant Services, World Trade Center, Thomas Rush, in his capacity as Manager of the World Trade Center, Ken Philmus, in his capacity as Manager of the Port Authority Bus Terminal, Barbara Ann Davis, in her capacity as Administrator of the Port Authority Bus Terminal, and Pearline Washington, in her capacity as Administrator of the Port Authority Bus Terminal, Defendants.

No. 96 Civil 1438 (SAS).

United States District Court,
S.D. New York.

July 25, 1996.

Ira A. Sturm, Manning, Raab, Dealy & Sturm, New York City, for Plaintiffs.

Keith E. Harris, Arnold D. Kolikoff, Richard D. Williams, Milton H. Pachter, The Port Authority of New York and New Jersey, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs seek a preliminary injunction enjoining Defendants from interfering with their exercise of First Amendment rights at the World Trade Center Concourse ("WTC Concourse" or "Concourse") and the Port Authority Bus Terminal ("Bus Terminal"). Specifically, Plaintiffs ask the Court to: (1) increase the number of areas in which they are permitted to engage in First Amendment activity at the WTC Concourse and the Bus Terminal, as well as the number of persons permitted to conduct such activity in each area; and (2) order Defendants to refrain from harassing Plaintiffs or otherwise interfering with their efforts to engage in First Amendment activity.

### I.  Factual Background

#### A.  Parties

Plaintiff Local 32B–32J, Services Employees International Union, AFL–CIO ("Local 32") is a labor organization representing approximately 67,000 building service employees in New York City and its surrounding area. Plaintiff Local 2, Service Employees International Union, AFL–CIO ("Local 2") is a labor organization that represents approximately 1,200 window cleaning employees in the metropolitan New York area.

Defendant Port Authority of New York and New Jersey ("Port Authority") is a bi-

state agency created in 1921 by a compact between the States of New York and New Jersey. The remaining Defendants are employees of the Port Authority. The Port Authority owns and/or operates thirty-seven public facilities in the Port of New York District,[1] including the World Trade Center and the Bus Terminal.

The Port Authority does not directly employ any member of the Plaintiffs. However, at the World Trade Center, cleaning and maintenance contractors employ members of Local 32 pursuant to a collective bargaining agreement. Until February 29, 1996, a security guard contractor at the World Trade Center also employed members of Local 32 under a collective bargaining agreement. In addition, prior to January 15, 1996, the cleaning contractor at the Bus Terminal employed workers pursuant to a collective bargaining agreement with both Local 32 and Local 2.

B. *Procedural History*

On January 4, 1996, over 30,000 members of Local 32 went on strike at office buildings throughout New York City. In connection with this strike, representatives of Local 32 attempted to engage in First Amendment activity at the WTC Concourse and became embroiled in a dispute with the Port Authority over the access they could have to this facility. On January 17, Local 32 brought suit against the Port Authority and its officials at the World Trade Center, seeking to enjoin Defendants from interfering with their exercise of First Amendment rights at the WTC Concourse. However, the citywide strike ended on February 4 and Local 32 agreed to terminate all lawsuits related to the strike.

Meanwhile, on January 15, 1996, the Port Authority implemented a cleaning contract at the Bus Terminal with a contractor that does

not have a collective bargaining agreement with Plaintiffs. On or about March 1, 1996, the Port Authority also began contracting security services at the World Trade Center to a contractor that does not have a collective bargaining agreement with Local 32. In the wake of these two developments, Plaintiffs desired to engage in First Amendment activity at both the Bus Terminal and the WTC Concourse, and became involved in a dispute with the Port Authority concerning the access they could have to these facilities. On February 28, 1996, as the security services contract at the World Trade Center was about to go into effect, Plaintiffs brought this action. They sought a temporary restraining order mandating the same relief requested here. After the Court held a settlement conference, the parties reached a compromise and agreed to mediation.[2] When the mediation proved unsuccessful, Plaintiffs proceeded with this motion.

C. *The World Trade Center*

The WTC Concourse is a series of interlocking corridors providing access to the office buildings which comprise the World Trade Center. The WTC Concourse serves 80,000 persons who are employed by tenants and 50,000 others who visit the World Trade Center each day. Tr. 4/25 at 160.[3] The Concourse is used most heavily during the rush hours of 7:00 a.m. to 10:00 a.m. and 4:00 p.m. to 6:00 p.m. when commuters travel to and from the subway stations and commuter railway terminal located beneath the Concourse. During these periods, approximately 90,000 pedestrians use the Concourse. *Id.* at 160, 181. Problems of pedestrian safety and congestion are most severe during these hours. Such problems are critical in the event of an emergency, such as the bombing of the World Trade Center that occurred on

---

1. The Port of New York District is the bi-state area which lies within a 25–mile radius of the Statue of Liberty.

2. The compromise reached by the parties provided that the rules promulgated on February 15, 1996 (*see* Part I.C., *infra* ) would remain in effect at the WTC Concourse. At the Bus Terminal, the compromise provided that the Port Authority would: (1) allow "roving" activity within the Terminal; (2) remove barriers at three "penned

in" areas outside of the Terminal; and (3) permit Plaintiffs to engage in First Amendment activity at two locations on 8th Avenue near Bus Terminal exits (*see* Part I.D., *infra* ).

3. "Tr." refers to the transcript of the preliminary injunction hearing which was held on April 25–26, and May 3 and 6, 1996. The numbers which follow (e.g., "4/25") refer to the date of the particular portion of the hearing.

February 26, 1993, or the discovery of a suspicious package or a major transportation delay. *Id.* at 173, 178.

The World Trade Center's construction was completed in 1975. The original design did not adequately provide for the volume of pedestrian traffic the Concourse currently experiences. The current volume exceeds the design volume by approximately twenty-five percent. Tr. 4/25 at 166–67. Pedestrian traffic has increased over the past 20 years because of developments inside and outside of the World Trade Center, including the construction of 7 World Trade Center, the World Financial Center, and the growth of the Tribeca neighborhood. Tr. 4/25 at 157–58, 167.

On January 14, 1988, the Port Authority issued rules governing the operation of both the WTC Concourse and the Bus Terminal. These rules do not set forth the locations where First Amendment activity may be conducted at the Concourse, nor the number of persons who may engage in such activity. *See* World Trade Center and Port Authority Bus Terminal, Revised Rules and Regulations, dated January 14, 1988, Ex. F to Pl.Ex. 8. In fact, until January 12, 1996, there were no written rules governing the exercise of free speech at the WTC Concourse. The parties dispute the extent to which First Amendment activity was permitted within the Concourse prior to that date, but agree that it was permitted at no more than four locations, with only one person allowed at each location.

On January 12, 1996, Edwin Monteverde, the General Manager of Tenant Services at the World Trade Center, wrote Local 32's attorneys concerning restrictions on First Amendment activity at the Concourse. *See* Letter of Edwin Monteverde, Ex. C to Pl.Ex. 8. His letter indicated that the Port Authority was willing to permit First Amendment activity at six specified locations in the Concourse. The Port Authority would permit

one person in each of four locations at all times the area is open to the public, except during rush hours. Five people would be permitted in each of two additional locations at the cross roads of the Concourse corridors, with two people permitted to display signs at each location.[4] *See id.* Finally, the letter noted that "we are will[ing] to engage in discussions to address a request for additional access to the World Trade Center Concourse." *Id.*

First Amendment activity at the WTC Concourse is now governed by rules promulgated by Charles Maikish, the Director of the World Trade Center, on February 15, 1996. *See* Regulations With Respect to Continuous Expressive Activity Directed at the Public In The World Trade Center, Pl.Ex. 6. These rules provide for the same access to the Concourse as was discussed in Monteverde's January 12 letter. Tr. 4/25 at 164, 180.[5] The Port Authority purportedly based these rules on a consideration of several factors, including: (1) the physical configuration of the Concourse; (2) pedestrian traffic; (3) security considerations after the February 26, 1993 bombing; (4) construction activities; (5) the cleaning and servicing of the building; and (6) the desires of people seeking to communicate to users of the Concourse. Tr. 4/25 at 179–80.

Use of all the Concourse locations is granted on a first-come, first-served basis. No discretion is exercised by Port Authority personnel. A person who wishes to use a location must sign a log-in sheet for each location he or she wants to use on the day he or she wants to use it. *See* Pl.Ex. 6. The person is then assigned a gray two-inch by two-inch identification card that indicates the assignment of the area to that person. One person may log in on behalf of a group; in such cases, the person will be assigned identification cards for distribution to members of the group. Tr. 4/25 at 182, 188; Tr. 4/26 at 202, 207, 213–14, 219, 269–70; Pl.Ex. 6.

---

4. The letter further indicated that both of these locations would be available whenever the surrounding area is open to the public. *See* Ex. C to Pl.Ex. 8.

5. The February 15 rules also provide for First Amendment activity at external entrances to the

World Trade Center. There are no restrictions on the number of people who may conduct First Amendment activity at these entrances. The rules only prohibit blocking entrances, stairways or pedestrian movement. *See* Pl.Ex. 6.

### D. The Port Authority Bus Terminal

The Bus Terminal is located between 40th and 42nd Streets and between 8th and 9th Avenues in Manhattan. It consists of two buildings, a North Wing between 41st and 42nd Streets, and a South Wing between 41st and 40th Streets. The Bus Terminal is used by at least 165,000 people each day, and is generally open to the public for 18 hours a day.[6] Between midnight and 6 a.m., however, only the North Wing Lower Bus Level is open for bus and passenger traffic. Tr. 5/3 at 9, 54.

There are no written rules that designate the locations presently available for First Amendment activity at the Bus Terminal, or the number of persons permitted in each location.[7] However, as a matter of practice, the Port Authority has adopted very specific rules. During the 18 hours per day that the Bus Terminal is open to the public, First Amendment activity may be conducted by thirty-six people in a total of seven fixed locations. In the Main Concourse, six people are permitted in each of three locations, and two are permitted in one additional location. In the Suburban Concourse, six are allowed in each of two locations and four are permitted in one other location. Tr. 4/25 at 127–30; Tr. 5/3 at 21–24, 59–60. The seven fixed locations were selected as sites for First Amendment activity because they are close enough to pedestrian traffic to provide access to an audience, but are out of the direct paths of pedestrian traffic. Tr. 5/3 at 21–25. These locations are consistent with recommendations made in studies conducted in 1988 and 1990 regarding appropriate areas for conducting First Amendment activity directed at the public. Tr. 5/3 at 38, 69.[8]

A person wishing to apply for space to conduct First Amendment activity at the Bus Terminal must fill out a permit request form. However, the form used at the Bus Terminal has been in existence since 1986 and is obsolete in certain respects. Although the form purports to list all of the locations available for First Amendment activity, it is no longer accurate. Certain areas have been shifted to accommodate changes in the structure of the Bus Terminal; positions at the Upper and Lower Bus Levels have been eliminated due to construction; and two additional areas have been added in the Main Concourse and Suburban Concourse. See Permit Request Form, Def.Ex. B.; Tr. 5/3 at 7, 10, 17–18. The total number of people who may engage in First Amendment activity at fixed locations has been reduced from 38 to 36. See Letter from Richard D. Williams, Attorney for Defendants, dated March 1, 1996, Def.Ex. A; Def.Ex. B.

In addition to the activity permitted at fixed locations, ten people may communicate with Bus Terminal patrons by walking through the Bus Terminal as "rovers." Tr. 5/3 at 25. The ten rovers are currently permitted as part of the compromise previously reached by the parties, and are required to operate in a manner that does not obstruct the flow of pedestrian traffic. Tr. 4/25 at 76, 78, 80, 81. However, the permit request form also describes rovers, and De-

**6.** Access to certain areas is restricted during the 18 hours the Bus Terminal is generally open. Access to the upper level of the South Wing, the third floor of the North Wing and the Lower Levels of the North and South Wings is limited to ticketed passengers. These areas are gate areas and serve only to facilitate the exit and entry of buses. Access to these areas has been limited since the mid–1980s in an effort to reduce crime. Tr. 4/25 at 88, 121–33, 137–38, 140; Tr. 5/3 at 14–15, 44–46.

**7.** The rules promulgated by the Port Authority on January 14, 1988 set forth the procedures to be followed by one wishing to conduct First Amendment activity at the Bus Terminal. See Ex. F. to Pl.Ex. 8. While these rules also set forth the locations that were available for First Amend-

ment activity in 1988, they are outdated. Some locations have been shifted because of changes in the structure of the Bus Terminal. Others have been eliminated because of construction, or because they were in parts of the Bus Terminal that are no longer open to the public. Tr. 4/25 at 121–33; Tr. 5/3 at 14–15.

**8.** The current locations are inconsistent with the studies in one important respect. The studies recommended establishing locations on the Subway Mezzanine level. This recommendation was adopted and expressive activity was permitted on the Subway Mezzanine level through 1994. However, due to resulting traffic congestion, the locations on the Subway Mezzanine level were subsequently eliminated. Tr. 5/3 at 57–58, 65–66.

fendants have indicated that they do not object to the continuation of roving activity.

First Amendment activity is also allowed on the sidewalks outside of the Bus Terminal. In anticipation of such activity by Plaintiffs, Defendants established areas where Plaintiffs would be visible to the crowds, but would not disrupt traffic patterns. Tr. 4/25 at 42–43, 49–50. One such area was established on 42nd Street from 8th Avenue towards 9th Avenue, and is over 50 feet long and can accommodate up to 75 people. Tr. 4/25 at 49. A second area was established on 41st Street between 8th and 9th Avenues, and a third on 40th Street and 9th Avenue.[9] As part of the compromise negotiated by the parties, two smaller areas were added on 8th Avenue, near the south exits of the North and South Wings. These areas are cordoned off on three sides and are each large enough for five people. Defendants have no objection to continuing to allow activity at these locations.

Permit request forms are available at the Bus Terminal from 8:30 a.m. to 9:30 a.m. and from 2:00 p.m. to 3:00 p.m., and permits are valid for fourteen days. Tr. 4/25 at 32, 90. A completed permit request form must be submitted no less than 36 hours and no more than seven days before the activity is to commence. Tr. 4/25 at 120; Tr. 5/3 at 50; Tr. 5/6 at 79–80. This waiting period enables Port Authority personnel to prepare for any contingencies that the requested activity might engender, such as counterdemonstrations. Tr. 5/3 at 47–50. In order to determine whether such an occurrence is likely, Port Authority personnel review the contents of any materials that will be distributed by the individual or group requesting a permit. However, no one has been refused permission to engage in First Amendment activity at the Bus Terminal because of the content of the materials to be disseminated. Tr. 4/25 at 91–94, 99; Tr. 5/3 at 33. In fact, locations for First Amendment activity are given out on a first-come, first-served basis, without any exercise of discretion. Tr. 4/25 at 99, 115; Tr. 5/3 at 33; Tr. 5/6 at 111.

## II.  *Legal Standard*

A party seeking injunctive relief must ordinarily demonstrate:

> (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995). However, the movant is required to meet a higher standard where the injunction would alter the status quo by commanding a defendant to perform a positive act. *See id.* at 33–34. An order granting such relief is known as a "mandatory injunction," and will issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* at 34 (quoting *Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)); *see also SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir. 1990) (injunction which alters status quo requires "a more substantial showing of likelihood of success").

■ In the present case, the requested injunction is largely mandatory. Plaintiffs seek greater access to the WTC Concourse and the Bus Terminal than is presently permitted. An order granting this relief would effect a dramatic shift in policy at both locations and require the Port Authority to issue new rules and procedures for regulating First Amendment activity. *See Jolly v. Coughlin,* 76 F.3d 468, 474 (2d Cir.1996) (characterizing injunction as mandatory where it would require a "dramatic shift" in policy of Department of Correctional Services). Plaintiffs must therefore meet the heightened standard required for a mandatory injunction to issue.

## III.  *Analysis*

### A.  *Forum Analysis*

The Supreme Court has adopted a "forum based" approach for evaluating restrictions

---

9. These areas were originally cordoned off on all sides. However, the Defendants agreed to remove the barriers on the west side of the first two locations, and on the east and west sides of the third location. Defendants do not object to maintaining these locations in this fashion.

that the government places on the use of its property. *See Int'l Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). Under this approach, public property is divided into three categories: (1) the traditional public forum, property which has historically been available for public expression; (2) the designated public forum, property the state has specifically selected for First Amendment activity; and (3) the nonpublic forum. Any effort to regulate speech on property that falls into the first two categories is subject to heightened scrutiny. Although content-neutral time, place and manner restrictions may be promulgated, they must be narrowly drawn to serve a significant governmental interest, and must leave open ample alternative means of communication. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983). By contrast, regulations concerning non-public fora are permissible provided they are reasonable and do not discriminate on the basis of the speaker's viewpoint. *Id.* at 46, 103 S.Ct. at 955–56.

Plaintiffs assert that the Bus Terminal and the WTC Concourse are traditional public fora. They rely upon the Second Circuit's holding in *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). There, the court held that the Bus Terminal is a public forum, stating:

> [The Terminal] is a thoroughfare used by thousands of people each day. It is one of the busiest passageways in the country, with persons hurrying to and from subways, buses, shops, theaters, and other streets. In design and physical appearance, the main concourse resembles a street.
>
> .    .    .    .    .
>
> The Terminal building is an appropriate place for expressing one's views precisely because the primary activity for which it was designed is attended with noisy crowds and vehicles, some unrest and less than perfect order.... [I]t seems undeniable that the place should be available for use in appropriate ways as a public forum.

*Id.* at 89–90. Plaintiffs suggest that the court's reasoning in *Wolin* applies to the WTC Concourse with equal force, and argue that both facilities are therefore public fora. Defendants do not dispute this point; rather, they contend that the speech regulation meets the heightened standard required where a public forum is involved. Because both parties assume that the WTC Concourse and the Bus Terminal are public fora, I shall apply the heightened scrutiny appropriate for public fora.

**B.** *Increased Access to the WTC Concourse*

■ Plaintiffs have provided ample evidence to conclude that the regulations at the WTC Concourse are not narrowly tailored to serve the Port Authority's interest in protecting the public's safety. First, Plaintiffs offered evidence of a study conducted in 1992 by the World Trade Center's Management Engineering & Analysis Department. *See* WTC Free Speech Study—Final Report, dated August 27, 1992, Pl.Ex. 3; WTC Free Speech Study—Final Report Outline, Pl.Ex. 5. The study analyzed traffic flow patterns at the WTC Concourse and was designed to assist management in selecting locations appropriate for First Amendment activity. Based on the results of this analysis, the study recommended that the Port Authority make three free speech locations available during rush hours, and up to twelve available during off-peak hours. *See* Pl.Ex. 3; Pl.Ex. 5. These recommendations are far more generous than the free speech policy adopted by the Port Authority on February 15, 1996.

Second, Plaintiffs offered evidence that First Amendment activity has previously been conducted in the WTC Concourse on a much larger scale than is currently permitted. Specifically, Plaintiffs introduced two prior orders of this Court which granted greater access to those wishing to engage in First Amendment activity in the Concourse in the late 1970s. The first permitted 65 people to engage in such activity, while the second permitted 135 to do so. *See* Court Orders, Ex. E to Pl.Ex. 8.

Defendants correctly point out that conditions at the WTC Concourse have changed

since the 1970s. Problems associated with pedestrian traffic are greater at the WTC Concourse now than they were in the 1970s. Tr. 4/25 at 157–58, 167. Moreover, the world is a different place today than it was twenty years ago. The 1993 bombing of the World Trade Center has increased the Port Authority's awareness of the potential for terrorist activity in New York City's most congested areas, Tr. 4/25 at 186, and Defendants cannot be faulted for taking this into consideration when regulating First Amendment activity. Nonetheless, the extreme disparity between the number of people previously permitted to engage in First Amendment activity at the Concourse and the number permitted under the February 15 rules suggests that the current rules are unreasonably restrictive.

Third, and most important, the events leading to the promulgation of the February 15 rules suggest that they are not narrowly tailored to protect public safety. In early January 1996, representatives of Local 32 began negotiating with the Port Authority concerning the access they would be given to conduct First Amendment activity at the WTC Concourse. On January 12, Defendant Monteverde wrote a letter offering Local 32 exactly the same access to the Concourse as was subsequently permitted under the February 15 rules. *See* Ex. C to Pl.Ex. 8. This letter was clearly meant as a negotiating tactic, not a statement of the maximum access the Port Authority could safely provide. In fact, the letter explicitly states that "we are willing to engage in discussions to address a request for additional access to the World Trade Center Concourse." *Id.* Yet despite this early indication that the rules were negotiable, the Port Authority ultimately adopted them in their entirety.

■ The history behind the February 15 rules suggests that they were not meant as a good-faith effort to balance the competing interests of free expression and public safety, but as a litigation tactic designed to stonewall Plaintiffs' efforts to engage in meaningful First Amendment activity. Because Plaintiffs have demonstrated that the February 15 rules are not narrowly tailored to protect public safety, and thus violate the First Amendment, they have established a clear likelihood of success on the merits. Moreover, " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Hsu v. Roslyn Union Free School District,* 85 F.3d 839, 853 (2d Cir.1996) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976)). Plaintiffs are therefore entitled to injunctive relief on their claim for greater access to the WTC Concourse.

■ Plaintiffs request access to the Concourse commensurate with that provided by this Court's orders from the 1970s. However, Defendants have demonstrated that conditions at the Concourse have changed since the 1970s, and that the access granted under these orders is no longer appropriate. On the other hand, the current regulations are unduly restrictive. Defendants are therefore directed to promulgate new rules which are narrowly tailored to protect public safety while accommodating free speech at the WTC Concourse. These rules must provide substantially more access for persons wishing to conduct First Amendment activity at the Concourse than is permitted under the February 15 rules. The current rules will remain in effect until the new rules are promulgated or until any challenge to those rules is resolved, whichever is later. If the new rules are not promulgated within thirty (30) days of this Order, the Court will consider imposing appropriate rules after a further hearing on this issue.[10]

---

10. Plaintiffs object to the requirement that people engaging in First Amendment activity at the WTC Concourse wear two-by-two inch cards indicating that they are authorized to engage in such activity. Although Plaintiffs contend that this is an unconstitutional infringement upon their First Amendment rights, they have not cited a single case in support of this proposition. Contrary to Plaintiffs' claim, this requirement is a perfectly appropriate and minimally intrusive means of insuring that the locations set aside for First Amendment activity are used only by those authorized to use them. The authorization cards, which are smaller than standard business cards, promote public safety by preventing conflicts between groups over the use of designated areas and by enabling the Port Authority to determine who should be removed from such an area when it becomes overcrowded. By permitting officials to tell, at a glance, who is entitled to

### C. *Increased Access to the Bus Terminal*

Plaintiffs have not carried their burden of demonstrating a clear likelihood that they will succeed on their claim for greater access to the Bus Terminal. The evidence showed that Defendants narrowly tailored the restrictions at the Bus Terminal in an effort to permit ample First Amendment activity while serving the vital governmental interest in protecting the public's safety. Tr. 4/25 at 49–50, 54, 80–81, 87, 173; Tr. 5/3 at 21–25; Tr. 5/6 at 111. The evidence further indicated that the restrictions on First Amendment activity were applied in a content-neutral fashion, on a first-come, first-served basis. Tr. 4/25 at 99, 115; Tr. 5/3 at 33.

### 1. Clear Likelihood of Success
#### a. Narrowly Tailored

■ In contrast to the rules applied at the WTC Concourse, the rules at the Bus Terminal balance free speech interests with public safety concerns. During all hours that the Bus Terminal is open to the public, the rules permit thirty-six people to engage in free speech at seven fixed locations. Tr. 4/25 at 127–30; Tr. 5/3 at 21–24, 59–60. First Amendment activity is also permitted on the sidewalks outside the Bus Terminal. Tr. 4/25 at 49. Moreover, as part of a compromise reached by the parties, the Port Authority has permitted roving activity within the Bus Terminal, and has made two areas on 8th Avenue available for First Amendment activity.

Plaintiffs attempt to demonstrate that the restrictions at the Bus Terminal are not narrowly tailored by pointing to outdated rules that previously permitted greater access to those conducting First Amendment activity there. Tr. 4/25 at 165–66. However, the evidence demonstrated that this disparity is merely the result of changed conditions at the Bus Terminal. Construction and efforts to reduce crime have caused certain areas of the Bus Terminal to be closed to the public. Tr. 4/25 at 82; Tr. 5/3 at 18. The Port Authority has continued to permit First Amendment activity in the areas which remain open to the public.

Plaintiffs next argue that the restrictions are not narrowly tailored because they are more restrictive than the recommendations made in traffic flow studies of the Bus Terminal. However, the seven locations currently available on the Main Concourse and the Suburban Concourse are largely consistent with studies conducted in 1988 and 1990. Each of these studies recommended nine locations. *See* Attachment II to each study in Def.Ex. E. The two locations that were not selected were adjacent to and duplicative of others. Tr. 5/3 at 69. Although the studies also recommended locations on the Subway Mezzanine level, actual experience revealed that their use resulted in severe traffic problems. Tr. 5/3 at 57–58, 65–66.[11]

While the Port Authority's current rules are somewhat more restrictive than the recommendations made in the traffic flow studies, this disparity is largely attributable to public safety concerns and the operational needs of the facility. Moreover, even if the Port Authority could have adopted some of the studies' recommendations without jeopardizing these concerns, this fact would not establish that the rules are unconstitutionally restrictive. The Supreme Court has explicitly held that a time, place and manner restriction does not fail the "narrowly tailored" test simply because it is not the least restrictive means of protecting a governmental interest. *See Ward v. Rock Against Racism,* 491 U.S.

---

use a designated area, the authorization cards actually minimize governmental interference with persons engaged in First Amendment activity. In fact, if a similar procedure were used at the Bus Terminal, much of the "harassment" of which Plaintiffs complain would likely have been avoided. *See* Part III.D., *infra*.

11. At the preliminary injunction hearing, Plaintiffs also questioned the need for a thirty-six hour waiting period at the Bus Terminal. The evidence revealed that this waiting period enables the Port Authority to prepare for contingencies that "controversial" activity might cause, such as counterdemonstrations. Thus, for example, the waiting period was helpful when an anti-abortion demonstration was held at the Bus Terminal. Tr. 5/3 at 47–50. Although Plaintiffs are probably right that the waiting period is useful only in exceptional circumstances, the requirement that the Port Authority's policies be content neutral compels the application of the waiting period to all applicants.

781, 797, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (the "less-restrictive-alternative analysis ... has never been a part of the inquiry into the validity of a time, place, and manner regulation") (internal quotation omitted).

### b. Content Neutral

■ Plaintiffs also claim that the restrictions at the Bus Terminal are not content neutral. In support of this argument, Plaintiffs contend that the rules have been applied to Plaintiffs in an unfair manner, and place far too much discretion in the hands of Port Authority employees.[12] These arguments are unpersuasive. The uncontroverted testimony before the Court was that the Port Authority's policies (at both the Bus Terminal and the WTC Concourse) are applied without discrimination as to the content of the expression or the identity of the speaker. Tr. 4/25 at 99, 115, 182, 188; Tr. 5/3 at 33; Tr. 5/6 at 111.

Plaintiffs contend that the rules at the Bus Terminal have been applied in a discriminatory manner, noting that when they initially requested the "maximum access" available at the Bus Terminal, they were given fewer spaces than were actually available. Tr. 4/25 at 96–97. However, there was no evidence that this was caused by any discriminatory animus toward Plaintiffs. Rather, the evidence demonstrated that it was the result of a mistake caused in part by a poor recordkeeping system then in effect. This inadequate recordkeeping system was used for all applicants, not just Plaintiffs, and has subsequently been corrected. Tr. 5/6 at 91, 92–95, 107–109, 116; Bus Terminal Free Speech Permit Chart, February 1996, Pl.Ex. 13; Bus Terminal Free Speech Permit Charts, March 1996, Def.Exs. H, I.

Plaintiffs also assert that the thirty-six hour waiting period at the Bus Terminal is not applied in a content-neutral manner. In support of this argument, Plaintiffs produced evidence of a single instance in which another group was permitted to engage in First Amendment activity without waiting the requisite thirty-six hours. Tr. 4/25 at 108. While this is troubling, there is no reason to believe it is anything other than an isolated error. In fact, because the activity in question was not properly recorded on charts used by the Port Authority, it appears clear that this error was caused by the poor recordkeeping system formerly in effect. Tr. 4/25 at 109. Under current procedures, such a mistake is unlikely to reoccur.

Plaintiffs argue that the rules at the Bus Terminal place too much discretion in the hands of Port Authority employees. They note that there are no written rules or regulations that designate the areas presently available for First Amendment activity at the Bus Terminal, or the number of persons permitted in each area. "The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation," *Lebron v. National R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir.), *amended,* 74 F.3d 371 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996), and the evidence demonstrates that

---

12. Plaintiffs also contend that the rules at the WTC Concourse place too much discretion in the hands of Port Authority employees. Rule 9 of the Port Authority's Rules and Regulations for the World Trade Center provides, in pertinent part:

No person shall post, distribute, exhibit, inscribe, paint or affix ... printed or written or pictorial matter ... in, on or to any part of the common areas and facilities of the World Trade Center *without the prior written consent of the Manager of the World Trade Center.*

Ex. B to Pl.Ex. 8 (emphasis added). This rule grants the Port Authority an impermissible degree of discretion and must be stricken. *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (decision to permit free speech may not be vested "in the unbridled discretion" of government employees). A new provision may be drafted which will permit the Port Authority to proscribe the use of "obscenity" or "fighting words" that may endanger public safety. *See Miller v. California,* 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) (obscene material is unprotected by the First Amendment); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942) (no First Amendment protection for words that are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace"). However, any such provision must be viewpoint-neutral. *See R.A.V. v. St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992) ("government may not regulate [fighting words] based on hostility—or favoritism—towards the underlying message expressed").

the Port Authority has granted access purely on a first-come, first-served basis. Tr. 4/25 at 99, 115; Tr. 5/3 at 33; Tr. 5/6 at 111. Nonetheless, the absence of updated written rules presents a danger that discretion will be improperly exercised in the future. Defendants are therefore ordered to promulgate updated written rules for First Amendment activity at the Bus Terminal. These rules must encompass all of the locations where First Amendment activity is currently permitted at the Bus Terminal. This includes the two areas on 8th Avenue near the south exits of the North and South Wings, as well as the roving activity permitted within the Terminal, neither of which has caused problems for the Port Authority.

### 2. Extreme Damage

■ Plaintiffs have not made any showing that they will suffer "extreme or very serious damage" if a preliminary injunction is not granted with respect to increased access to the Bus Terminal. Because the Port Authority's policies comport with the First Amendment, such a showing is not possible. Plaintiffs have ample access to the Bus Terminal; they are permitted to engage in First Amendment activity at the exterior entrances to the facility, and at seven fixed locations within the Bus Terminal. Plaintiffs have established only that they want greater access than they currently have to this facility, not that their First Amendment rights are being compromised or even that the Port Authority rules prevent them from communicating their message in an effective manner.

### D. *Harassment*

■ Plaintiffs also ask the Court to enjoin the Port Authority from subjecting them to threats or harassment, or otherwise interfering with their First Amendment rights at both the WTC Concourse and the Bus Terminal. Plaintiffs have failed to demonstrate a pattern of harassment or of any other behavior warranting injunctive relief. The incidents cited by Plaintiffs are either (1) wholly innocent, (2) not indicative of any bias toward Plaintiffs, or (3) wrongful, isolated errors by individual Port Authority employees.

Many of the incidents cited by Plaintiffs are completely innocuous. For example, Plaintiffs presented evidence of two instances in which Port Authority police officers approached permit-holding representatives of Plaintiffs and questioned their right to engage in First Amendment activity in the Bus Terminal. In one instance, the officer walked away after being told that the activity was occurring pursuant to a permit. Tr. 4/26 at 225. In the other instance, the officer apologized after verifying that Plaintiffs' representatives had permits. Tr. 4/26 at 220–24, 231, 233–34.

Other conduct by Port Authority employees, even if wrongful, does not reflect any bias against Plaintiffs or their effort to engage in First Amendment activity. For example, Plaintiffs presented evidence that Ronald Goldman, one of their attorneys, was detained by an unidentified Port Authority police officer after being observed photographing bus ramps that lead into the Bus Terminal. Mr. Goldman was detained only after refusing to identify himself. Once a superior officer arrived on the scene, Mr. Goldman identified himself, and was permitted to leave after brief questioning. Tr. 4/25 at 10–12, 14, 19, 25, 29. In light of the recent history of terrorism in New York City, the unidentified officer's decision to detain Mr. Goldman is somewhat understandable. Even if the officer acted wrongly, however, his actions cannot reflect a bias against Plaintiffs since he was not informed of Mr. Goldman's affiliation with Plaintiffs.

Plaintiffs have pointed to a few instances in which Port Authority employees acted in a manner which interfered with their right to engage in First Amendment activity. They presented evidence that an unidentified Port Authority employee told one of Plaintiffs' representatives that he was not permitted to be in one of the designated locations at the WTC Concourse, even though he was displaying a card authorizing him to engage in First Amendment activity there. Tr. 4/26 at 212. Plaintiffs also presented evidence that on March 4 and March 5, the person in charge of issuing cards for the use of locations at the WTC Concourse was not avail-

220

able to Plaintiffs until 11:30 a.m. Tr. 4/26 at 202–06.

The isolated instances of misconduct cited by Plaintiffs are insufficient to support the issuance of an injunction. *See Rizzo v. Goode,* 423 U.S. 362, 373–75, 96 S.Ct. 598, 605–06, 46 L.Ed.2d 561 (1976) (reversing grant of injunctive relief where there were individual incidents of police misconduct, but no "pervasive pattern" of discrimination). Moreover, because these incidents occurred several months ago, and Plaintiffs have not shown that such conduct is ongoing or likely to occur in the future, injunctive relief is inappropriate. *See Farmland Dairies v. McGuire,* 789 F.Supp. 1243, 1250 (S.D.N.Y. 1992) ("To obtain injunctive relief based on past injury, the plaintiff must show a real and immediate threat that the injury will be continued or repeated."). Plaintiffs have failed to demonstrate any danger that they will suffer irreparable harm in the absence of injunctive relief. Their request for an injunction is therefore denied.

IV. *Conclusion*

Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. At the WTC Concourse, Plaintiffs are entitled to greater access for First Amendment activity than is presently permitted, and the Port Authority is ordered to promulgate rules providing such access within 30 days. In addition, Rule 9 of the Port Authority's Rules and Regulations for the World Trade Center violates the First Amendment and must be stricken. At the Bus Terminal, Plaintiffs are not entitled to greater access than is currently available. However, Defendants are ordered to promulgate rules regarding First Amendment activity at the Bus Terminal in accordance with Part III.C.1.b. of this opinion. Finally, Plaintiffs' request for an injunction enjoining the Port Authority from harassing them is denied.

SO ORDERED.

