LOCAL 32B–32J, SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, for and on behalf of its members; and Local 2, Service Employees International Union, AFL–CIO, for and on behalf of its members, Plaintiffs,

v.

PORT AUTHORITY OF NEW YORK AND NEW JERSEY; The Port Authority of New York and New Jersey Police; Frank B. Fox, in his capacity as Acting Superintendent of Police of the Port Authority of New York and New Jersey; Gene Ceccarelli, in his capacity as Captain of the Port Authority of New York and New Jersey Police; Charles Maikish, in his capacity as Director & Chief Executive Officer of the World Trade Center; Edwin Monteverde, in his capacity as General Manager, Tenant Services, World Trade Center; Thomas Rush, in his capacity as Manager of the World Trade Center; Ken Philmus, in his capacity as Manager of the Port Authority Bus Terminal, Barbara Ann Davis in her capacity as Administrator of the Port Authority Bus Terminal; and Pearline Washington, in her capacity as Administrator of the Port Authority Bus Terminal, Defendants.

No. 96–Civ.–1438 (SAS).

United States District Court, S.D. New York.

April 21, 1998.

Ira A. Sturm, Raab & Sturm, L.L.P., New York City, for Plaintiffs.

Milton H. Pachter, Keith E. Harris, The Port Authority of New York and New Jersey, New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Local 32B–32J, Service Employees International Union, AFL–CIO ("Local 32B") and Local 2, Service Employees International Union, AFL–CIO ("Local 2") filed a complaint on February 28, 1996 alleging that the defendants (hereinafter referred to collectively as "the Port Authority") violated their First Amendment rights by promulgating and enforcing certain rules regulating expressive activity at the World Trade Center ("WTC") and the Port Authority Bus Terminal ("Bus Terminal"). A trial was held on November 12–21, 1997. On November 24, 1997, the jury reached a verdict, finding for plaintiffs on the issue of liability, but awarding only nominal damages. Based on largely the same evidence that was presented to the jury,[1] I now address plaintiffs' request for permanent injunctive relief.

## I. Collateral Estoppel Effect of the Jury Trial

■ A preliminary issue is whether the court is bound by the findings of fact made by the jury. When an action contains both legal and equitable claims, a court that sits in equity following a jury trial is "not free to reject the jury's determination of facts essential to both the legal and equitable claims,"

due to the collateral estoppel effect of the jury verdict. *Guzman v. Bevona*, 90 F.3d 641, 647 (2d Cir.1996). However, a jury's finding of fact is not "essential" within the meaning of this rule unless the court can determine with confidence that the verdict actually relied on it. Thus, a verdict that could have been premised on any one of a number of different factual determinations has no estoppel effect. *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir.1991) ("If an issue was not actually decided in a prior proceeding, or if its decision was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel."); *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 728 (2d Cir.1981) (general jury verdict for defendant did not preclude relitigation of an issue that may or may not have been decided by the jury); *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, 811 F.Supp. 89, 92 (E.D.N.Y.1993).

■ Here, the jury found that the Port Authority had violated the plaintiffs' First Amendment rights at both the WTC and the Bus Terminal, *see* Trial transcript ("Tr.") at 793, having been instructed that such a violation could be found if either the Port Authority's written rules or its informal practices regarding expressive activity exceeded constitutional limitations. *See* Tr. at 748–50. The verdict did not specify whether it was based upon the written rules, the unwritten practices, or both. *See* Tr. at 793. Because it therefore cannot be determined what acts the jury found to be violative of the Constitution, different findings of fact are not precluded by collateral estoppel. In any event, as the next section will show, the court's findings are entirely consistent with those of the jury.

## II. Findings of Fact

### A. Introduction

Local 32B and Local 2 are labor organizations that represent building service and win-

---

1. I rely in part on evidence that was presented at a pre-trial hearing held on July 18, 1997, as well as on a document captioned "REVISED REGULATIONS CONCERNING CONTINUOUS EXPRESSIVE ACTIVITY AT THE PORT AUTHORI-TY BUS TERMINAL," dated August 12, 1997 (hereinafter "Bus Terminal Rules"). The latter was entered into evidence by a stipulation of the parties dated April 20, 1998.

dow cleaning employees in the New York City metropolitan area. *See* Joint Pretrial Order, Undisputed Facts ("Undisputed Facts") at ¶¶ 1–2. The Port Authority is a bi-state agency created in 1921 by a compact between the States of New York and New Jersey. The Port Authority operates a variety of facilities in the New York area, including the WTC and the Bus Terminal. *See id.* at ¶ 3.

Plaintiffs began strikes at both sites in January, 1996. *See* Tr. at 45, 81–82.[2] During these strikes, the Port Authority failed to apply its regulations regarding free speech activity evenhandedly: As many of the Port Authority's witnesses admitted, plaintiffs were forced to abide by rules from which other groups were exempted. ·*See, e.g.*, Tr. at 140, 380–88, 400–01, 413. The Port Authority has recently replaced the rules that were in effect when these events occurred. This opinion addresses only its new guidelines. Plaintiffs' demonstrations are ongoing. *See* Tr. at 161, 523.

### B. The WTC Guidelines

The new WTC rules define "expressive activity" as the "[c]ontinuous display of a sign to passersby, [the] continuous distribution of literature to passersby, [or] continuous speech to passersby." Defendants' Ex. E at ¶ 1(a). Expressive activity is prohibited at the WTC except in specified parts of its "Concourse" and "Plaza" areas and on its "[p]erimeter sidewalks." *Id.* at ¶ 1(b).

Thirteen spots are designated for expressive activity in the Concourse area. Eleven of these accommodate only one speaker. *See id.* at unnumbered page 6. According to the rules as written, the remaining two accommodate up to five people; at trial, however, the WTC's General Manager for Tenants' Services admitted that they are no longer available. *See* Trial Transcript ("Tr.") at 488. Four spots are available in the Plaza area, each accommodating one person. *See* Defendants' Ex. E at unnumbered page 5. No limit is given as to the number of people

who may engage in expressive activity on the perimeter sidewalks.

To obtain the right to use one of the designated areas in the Plaza or Concourse areas, a would-be speaker must submit a written request to the WTC's Assistant Director during business hours. This request must be made no later than 36 hours in advance of the proposed use. The request must identify the site and time requested, the type of activity to be conducted, and the name and address of the person making the request. A request will be denied only if it is incomplete, the area requested is unavailable, the proposed activity will violate other provisions of the rules, or if the Assistant Director determines that there exists

> an emergency such as a snowstorm, fire, accident, power failure, transportation delay, or other condition such that the conduct of permitted activities would cause a danger to persons or property or unreasonably interfere with pedestrian or vehicular traffic flow, the formation or progress of any line of persons waiting for service, such as a line at a sales, service or information kiosk, bus stop, taxi loading area, or automatic teller machine, or any construction or maintenance activity.

*Id.* at ¶¶ 3, 4(f). A space is considered unavailable for these purposes when it is occupied by a structure erected by the Port Authority. *See id.* at ¶ 4.

Requests will be granted or denied within 24 hours; if denied, the grounds for the denial will be set forth in writing. An appeal of a denial may be taken, but appeals are heard by the same Assistant Director responsible for the initial denial. A permit is valid for a maximum of seven days. *See id.* at ¶ 4. Even after a permit has been obtained, expressive activity otherwise within the rules may be prohibited by the Assistant Director if any of the conditions in the above quoted passage obtain. *See id.* at ¶ 3.

### C. The Bus Terminal Guidelines

The rules governing expressive activity at the Bus Terminal are similar to those cover-

---

**2.** A history of the circumstances which gave rise to the parties' dispute can be found in this Court's earlier opinion and order. *See Local*

*32B–32J, Service Employees Int'l Union v. Port Authority of New York and New Jersey,* 944 F.Supp. 208 (S.D.N.Y.1996).

ing the WTC. The Bus Terminal rules' definition of "expressive activity" substitutes "leaflets, fliers, brochures or other written communications" for "literature," but is otherwise the same. Bus Terminal Rules at ¶ 1(a). The permit procedure is the same except in that it provides for permits that remain valid for fourteen, rather than seven days. *See id.* at ¶ 6. The waiting period before permits become effective is identical. *See id.* At the Bus Terminal, the power to prohibit otherwise permitted expressive activity is vested in the Terminal Administrator rather than the Assistant Director, but the enumerated grounds for exercising this power are the same. *See id.* at ¶ 3. Finally, an expressive activity area is considered to be unavailable at the Bus Terminal when it is occupied by a Port Authority-built structure, just as it is at the WTC. *See id.* at ¶ 4(a). A maximum of 32 people are allowed to engage in expressive activity inside the Bus Terminal, 22 at fixed locations and 10 under "roving" permits. Two hundred and ten permits are available for the sidewalks surrounding the building. *See id.* at ¶ 4(b), unnumbered pages 5–6.

## D. Rationale for the Rules

The general justification proffered by the Port Authority for its rules is that unlimited expressive activity could impede the heavy flow of pedestrian traffic experienced at both sites and thereby create a safety hazard, particularly in an emergency situation. *See* Tr. at 600. Testimony defending the overall limits on the number of available permits at the Bus Terminal consisted exclusively of conclusory statements from Port Authority managers.[3] With regard to similar limits at the WTC, the Port Authority introduced a pedestrian flow study which concluded that a total of 17 people could engage in expressive activities in the Concourse and Plaza areas without substantial disruption of pedestrian

traffic. *See* Defendants' Ex. G at 1. However, a WTC safety official testified that 36 people could be accommodated safely in the Concourse area alone. *See* Tr. at 557–59.[4]

To support their contention that the limits were too low at both the WTC and the Bus Terminal, plaintiffs proffered expert testimony suggesting that the WTC Concourse could accommodate "well over 100" people engaged in expressive activity without impediment of safety or pedestrian traffic flow, and that even more could be accommodated at the Bus Terminal. Tr. at 292. Plaintiffs' expert, however, admitted that his study only dealt with the problems posed by people engaged in a rather limited form of expressive activity; i.e. stationary sign-holding. *See* Tr. at 318. In addition, the "protesters" in his study displayed signs that conveyed completely innocuous messages. *See* Tr. at 301. Real demonstrations, of course, will often involve more interaction between demonstrators and passersby, and therefore greater crowd-management concerns.[5] Defendants' study addressed these considerations in a somewhat more realistic manner by assuming that each person engaged in expressive activity would reduce the surrounding area available for pedestrian traffic by at least five feet. *See* Defendants' Ex. G at 7.

The Port Authority justified the 36 hour waiting period before permits become effective as necessary to allow adequate preparation for potentially disruptive demonstrations. *See* Tr. at 526. The presence of a large number of WTC employees and/or police during demonstrations has, from time to time, been necessary to ensure that the building remained open to, and safe for, public use. *See* July 18, 1997 Hearing Transcript ("July Hrg.") at 81–85.

## III. Conclusions of Law

### A. Permanent Injunction

To obtain permanent injunctive relief, a party must show (1) the absence of an

---

3. For example, Bus Terminal Deputy Inspector William Hall testified that: "I don't know of any traffic flow studies done at the Bus Terminal. The only study I have done is what I observe and what I feel is safe and not safe." Tr. at 404.

4. The same official testified that some areas in the WTC considered unsafe for expressive activi-

ty are routinely used for equally disruptive commercial activity. *See* Tr. at 544–48, 561–62.

5. A sign making a controversial statement on an emotive subject, for example, would be much more likely to draw a crowd than would the signs used in the study, which read "Happy Holidays." Tr. at 301.

adequate remedy at law and (2) the threat of irreparable injury if the relief is not granted. *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989). If a party can demonstrate that it is likely to be deprived of its constitutional rights in the future by the acts it seeks to have enjoined, both these requirements are satisfied. *See id.* (deprivation of constitutional rights "cannot be compensated by money damages"); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir.1998) (the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Plaintiffs are therefore entitled to a permanent injunction if they show that the Port Authority's rules are likely to abridge their First Amendment rights in the future. As the strikes at both the WTC and the Bus Terminal are ongoing, plaintiffs' rights are likely to be abridged if those rules exceed constitutional limits.

## B. Vagueness

 Plaintiffs first argue that their constitutional rights are endangered by the Port Authority's definition of "expressive activity," which they contend is impermissibly vague. As the Second Circuit has recently stated, the Due Process Clause "requires that laws be crafted with sufficient clarity 'to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.'" *General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 286 (2d Cir.1997) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Rules that implicate First Amendment rights are subject to a relatively strict form of vagueness review. *See id.*

As noted above, the WTC rules define "expressive activity" as the "[c]ontinuous display of a sign to passersby, [the] continuous distribution of literature to passersby, [or] continuous speech to passersby." [6] Plaintiffs contend that this definition is constitutionally infirm in that it "fails to state the number of people required to constitute expressive activity, fails to state what is [a] continuous

display, distribution or speech, nor to whom this definition applies." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls.' PFOF") at ¶ 82.

This argument is without merit. It is true that the definition does not indicate whether the presence of more than one person is required before "expressive activity" can commence. However, a person of ordinary intelligence would understand that, absent any suggestion to the contrary, the activity of a single person may fall within the definition. In the unlikely event of any confusion on this score, reference could be made to other provisions in the rules which designate numerous areas for expressive activity that have a one-person maximum. Similarly, an ordinary person would expect the definition to apply to anyone engaged in the described activity, given the lack of any apparent exceptions.

Plaintiffs' objection to the word "continuous" is only marginally more substantial. It is at least conceivable that one could experience doubt as to how long the activity in question has to persist in order to qualify as "continuous." The merely theoretical possibility of doubt, however, is insufficient to render a rule unconstitutionally vague. *See United States Civil Serv. Comm'n v. National Assoc. of Letter Carriers*, 413 U.S. 548, 578, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) ("[T]here are limits in the English language with respect to being both specific and manageably brief, and ... although the prohibitions [in dispute] may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand...."). A person of ordinary intelligence can distinguish between behavior that is brief and sporadic or unrepeated and that which is "continuous." *Cf. Hynes v. Mayor and Council of Oradell*, 425 U.S. 610, 621, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (ordinance that regulated canvassing on behalf of "recognized charitable cause[s]," but failed to define that term, was unconstitutionally vague). Certainly there is no evidence in the record to suggest that plaintiffs' members

---

**6.** The corresponding portion of the Bus Terminal rules is effectively identical. *See supra*, Part II.C.

were ever uncertain as to whether or not their protests consisted of "continuous" behavior. The rules' failure to define the term further therefore does not render them unconstitutionally vague.

## C. Discretion Vested in Port Authority Officials

Plaintiffs are on firmer ground when they argue that the WTC and Bus Terminal rules give Port Authority officials overbroad authority to prohibit expressive activity. Specifically, they point to provisions in the rules that give these officials the ability to deny applications for permits, or revoke permits that have been granted, in the event of conditions that "would cause a danger to persons or property or unreasonably interfere with pedestrian or vehicular traffic flow, [or] the formation or progress of any line of persons waiting for service." Defendants' Ex. E at ¶ 3; Bus Terminal Rules at ¶ 3.

 It is undisputed that both the WTC concourse area and the Bus Terminal are public forums for the purposes of First Amendment analysis. *See* Undisputed Facts at ¶¶ 35, Port Authority's Proposed Findings of Fact and Conclusions of Law at ¶ 2.[7] A regulatory scheme that allows the exercise of First Amendment rights in a public forum only after a permit is obtained effects a prior restraint of those rights. *See Forsyth Co. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Such a scheme passes constitutional muster only if, *inter alia,* the standards governing the award of permits are "narrow, objective and definite." *Shuttlesworth v. Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Standards that "involve[ ] appraisal of facts, the exercise of judgment, [or] the formation of an opinion" fail this test.

Forsyth County, 505 U.S. at 131, 112 S.Ct. 2395 (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)). It is apparent from the face of the rule in issue that it requires all three; it is therefore unconstitutional. While both public safety and (to a lesser degree) uninhibited movement of traffic are unquestionably legitimate governmental concerns, they cannot be safeguarded by regulations that pose a significant threat of arbitrary enforcement. *See Hague v. Committee for Indus. Org.,* 307 U.S. 496, 516, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (regulation that allowed city official to deny permits if he believed that such denial would prevent "riots, disturbances or disorderly assemblage" unconstitutional). *Cf. Heffron v. International Soc'y. for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (upholding a "straightforward first-come, first-served" permit regulation). The Port Authority is therefore enjoined from withholding or revoking permits on the basis of these rules.[8]

 For the same reasons, those provisions of the rules that allow the Port Authority to render expressive activity areas unavailable by erecting structures upon them are invalid as well. In light of the case law just cited, the constitutional infirmity of those provisions is patent: They place absolutely no limit on the Port Authority's ability to remove expressive activity areas from its permit system. The risk that they would be invoked arbitrarily is therefore acute, especially in light of the Port Authority's history of unequal enforcement of its rules. If the Port Authority wishes to use the expressive activity areas for its own purposes, it must obtain a permit like anyone else. *See Morton,* 516 F.2d at 729 (enjoining National Park Service from enforcing rules which gave

7. "A traditional public forum is one that 'by long tradition or by government fiat ha[s] been devoted to assembly and debate.' " *New York Magazine v. The Metropolitan Transp. Auth.,* 136 F.3d 123, 128 (2d Cir.1998) (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).

8. I do not mean to suggest by this that the Port Authority may not interfere with expressive activity at the sites under its jurisdiction when true

emergencies arise, only that such interference is improper under the rules now in effect. As the D.C. Circuit has held in similar circumstances: "[E]mergency withdrawal [of expressive activity permits] should be the subject of express standards formulated to provide for principled consideration by an official of responsible rank and function, and should be exercised only in accordance with those standards." *A Quaker Action Group v. Morton,* 516 F.2d 717, 735 (D.C.Cir. 1975).

Park Service-sponsored events exemption from permit requirement).[9]

## D. Permit Duration

 Plaintiffs also challenge the WTC rules' one week limit on the effectiveness of permits and the Bus Terminal rules' corresponding two week limit. As these rules govern the time, place and manner of expressive activity, they pass constitutional muster if they are "content-neutral, ... narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Loper v. New York City Police Dept.*, 999 F.2d 699, 702 (2d Cir.1993) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Plaintiffs concede that the Port Authority has a legitimate interest in preventing current permit holders from monopolizing expressive activity at either the WTC or the Bus Terminal. They argue, however, that the rules at issue are not "narrowly tailored" to achieve this goal because a less restrictive alternative could be implemented: Applicants could be given a permit that remains valid until someone else seeks permission to use the same space.

 While plaintiffs apply the wrong standard, their conclusion is correct. The Supreme Court has taken pains to emphasize that the existence of a less onerous alternative does not automatically invalidate time, place and manner speech limits: "Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place and manner of speech must be narrowly tailored ... but that it need not be the least restrictive or least intrusive means" of achieving the government's legitimate purpose. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see also Carew–Reid v. Metropolitan Transp.*

*Auth.*, 903 F.2d 914, 917–18 (2d Cir.1990) (district court's use of less-restrictive alternative analysis in the context of a challenge to a time, place or manner regulation was erroneous). Instead, a time, place, or manner regulation is narrowly tailored "so long as [it] promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

 Even under this more forgiving standard, however, the durational limits are invalid. The Port Authority suggests no reason why its interest in providing access to new applicants would be achieved less efficiently if permits were valid indefinitely, but subject to revocation (after some reasonable minimum period) upon the submission of a new application. I am cognizant of the fact that it is the Port Authority, and not this Court, that bears the heavy responsibility of ensuring the safety of the thousands of citizens who use the WTC and the Bus Terminal every day. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (Supreme Court's time, place and manner decisions do not "assign to the judiciary the authority to replace the Park Service as manager of the Nation's parks"). Absent extraordinary circumstances, however, courts may not defer to administrative judgments that implicate First Amendment rights. *See Federal Election Comm'n v. Larouche Campaign*, 817 F.2d 233, 234 (2d Cir.1987) (deference usually accorded to administrative subpoena inappropriate when First Amendment rights are at stake).[10] This is especially true in the present case, as the Port Authority has been virtually silent with respect to the necessity for its permit duration rules: Even were I tempted to defer to its judgment,

---

**9.** I do not, of course, enjoin the Port Authority from using areas ordinarily dedicated to expressive activity for construction or building maintenance purposes when there is a *bona fide* need to do so. If such use is of long duration, however, due consideration should be given to the possibility that replacement expressive activity areas could be made available.

**10.** *Cf. Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (Supreme

Court's "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society"); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (review of First Amendment-restricting prison regulations entitled to "wide-ranging" deference).

there is no evidence—save for the mere existence of the rule—that it made any judgment to defer to. Because reason suggests that a less restrictive rule would serve the Port Authority's legitimate interests just as effectively, and no evidence to the contrary has been introduced, the Port Authority is enjoined from enforcing the rule now in effect.[11]

### E. Waiting Period

■ Plaintiffs next challenge the provisions of the rules that impose a 36 hour waiting period before expressive activity permits become effective. They again concede the legitimacy of the provisions' ostensible purpose—allowing the Port Authority sufficient time to prepare for potentially disruptive demonstrations—but contend that the connection between this goal and the waiting period rules has not been adequately demonstrated.

I disagree. The Port Authority offered credible testimony at the pre-trial hearing regarding the utility of notice provisions in preventing expressive activity-related disruptions. Moreover, it is self-evident that expressive activity on controversial subjects may threaten public order absent a sizable police presence, and that such presence cannot always be arranged instantaneously. Finally, numerous courts have upheld longer waiting periods for expressive activity permits. *See, e.g., Morton,* 516 F.2d at 735 (48 hour waiting period upheld); *Powe v. Miles,* 407 F.2d 73, 84 (2d Cir.1968) (same). *Cf. NAACP v. Richmond,* 743 F.2d 1346, 1356–57 (9th Cir.1984) (twenty day waiting period struck down). Therefore, I cannot conclude that these provisions violate the First Amendment.

### F. Number Limits at the Bus Terminal

■ Plaintiffs also suggest that the 32 person limit on expressive activity permits in the Bus Terminal building is not narrowly tailored to further the goal of preventing congestion. They presented expert testimony to the effect that the Bus Terminal could safely accommodate vastly greater numbers of permit holders; this evidence was contradicted only by the conclusory statements of Port Authority employees. As discussed above, this Court cannot defer to the Port Authority's judgment as to the proper balance of safety and First Amendment concerns, particularly when that judgment is not supported by any substantive evidence. *See Richmond,* 743 F.2d at 1356 (court refused to defer to government's unsupported assertion that its expressive activity regulation constituted "a fair balance" between safety and free speech considerations); *Hickel,* 421 F.2d at 1118 ("There has been no effort here to justify the Government's [expressive activity regulation] beyond the flat words of the Secret Service director. First Amendment rights are too precious for sacrifice upon such an unsupported altar.").

While the study upon which plaintiffs rely made some unduly optimistic assumptions about the impact of expressive activity on pedestrian traffic, its conclusions were not wholly incredible. Because the uncontradicted evidence therefore suggests that the Port Authority's interest in maintaining order would be protected just as effectively by more liberal rules, the current limits cannot stand. I decline to specify a minimum number of permits that must be available; any new limits the Port Authority decides upon, however, must be founded upon something

11. The District of Columbia Circuit addressed a situation similar to this one in *Quaker Action Group v. Hickel,* 421 F.2d 1111 (D.C.Cir.1969). The plaintiffs there challenged Department of the Interior regulations that limited their ability to conduct large demonstrations in a park across the street from the White House. Relying on the obviously profound importance of protecting the President from assassination and its own presumed expertise in matters of security, the government argued that its judgment as to necessary safety precautions was entitled to deference. The court disagreed:

> The expertise of those entrusted with the protection of the President does not qualify them to resolve First Amendment issues, the tradi-

tional province of the judiciary.... To enable the court to reach a reasoned conclusion, it is incumbent upon any party who would invoke Presidential safety as a paramount consideration to provide the court with the information necessary to an even-handed decision.

*Id.* at 1118. Because the need for the challenged regulations was not self-evident, and the government offered only the conclusory statements of its employees to support them, the only "even-handed" decision the court could reach was that the regulations were invalid. The facts of this case are distinguishable from those of *Hickel* only in that the government here did not present even conclusory evidence justifying the necessity of its permit-duration rules.

more substantial than the gut impressions of its employees.

### G. Number Limits at the WTC

 The 25 person limit at the WTC is similarly invalid. The Port Authority did present a study in defense of the limit; moreover, for reasons I have discussed, I find this study to be somewhat more credible than the one relied on by plaintiffs. On the other hand, in light of the fact that the Port Authority proffered other evidence indicating that 40 people could be accommodated safely,[12] and its witnesses conceded that congestion-inducing commercial activity on a significantly larger scale is routinely tolerated,[13] I cannot conclude that the current ceiling is justifiable. Again, I decline to impose upon the Port Authority any specific minimum number of spaces it must provide. In determining its new limits, however, it may wish to take note of the fact that, on the evidence before me, I believe 40 spaces to be a reasonable number.

### H. Discriminatory Enforcement

 Finally, plaintiffs seek an injunction against future discriminatory treatment by the Port Authority with regard to its expressive activity rules. On their face, the current rules are incontestably content-neutral. As noted above, however, prior versions of these rules—which, insofar as they were written down, were also content-neutral—were enforced in a clearly discriminatory manner. Given this history, plaintiffs are entitled to an injunction prohibiting the Port Authority from deviating from the terms of the new rules in ways disadvantageous to them.

### IV. Conclusion

As written, several provisions of the Port Authority's expressive activity regulations covering the WTC and the Bus Terminal are likely to abridge plaintiffs' First Amendment rights unless an injunction is entered. The Port Authority is therefore enjoined from enforcing its current rules regarding 1) the denial of permits based on the discretionary judgments of its officers or the existence of Port Authority-built structures; 2) the maximum time for which permits remain valid; and 3) the total number of available permits at either the Bus Terminal or the WTC. This portion of the injunction shall go into effect one month from the date of this order so as to allow the Port Authority time to promulgate new regulations that pass constitutional muster. The Port Authority is immediately enjoined from administering its rules in a discriminatory manner. A separate Order will address the sole remaining issue of plaintiffs' application for an award of attorneys' fees.

SO ORDERED:

---

**12.** As indicated above, one WTC manager testified that 36 people could demonstrate safely in the WTC's Concourse area; under the rules now in effect, 4 more could do so in the Plaza area.

**13.** *See*, e.g., Tr. at 544–48, 561–62 (testimony of Anthony Marciano, WTC Assistant Chief Supervisor for Life, Safety, Fire and Security) (WTC accommodates sometimes long lines of soup vendor customers in heavily-used area; few, if any, are permitted to engage in expressive activity in the same area).