**MEDINOL LTD., Plaintiff,**

v.

**GUIDANT CORP. and Advanced Cardiovascular Systems, Inc., Defendants.**

**No. 03 Civ. 2604(SAS).**

United States District Court, S.D. New York.

June 4, 2004.

Keith R. Hummel, Rory O. Millson, Cravath, Swaine & Moore LLP, New York, NY, Christopher A. Hughes, Richard C. Komson, Dorothy R. Auth, Morgan & Finnegan, LLP, New York City, for Plaintiff.

J. Michael Jakes, Christine E. Lehman, Finnegan, Henderson, Farabow, Garrett & Dunner LLP, Washington, DC, Shari L. Steinberg, Yun G. Lee, Swidler Berlin Shereff Friedman LLP, New York City, for Defendants.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Medinol Ltd. ("Medinol") brings this action for damages and declaratory and permanent injunctive relief relating to the alleged infringement by Guidant Corp. ("Guidant") and its subsidiary Advanced Cardiovascular Systems, Inc. ("ACS") (collectively "defendants") of certain of Medi-

nol's patents.[1] Guidant now moves for summary judgement on the basis of collateral estoppel, arguing that Medinol's prior litigation over three of its patents—the '303, '120, and '018—in the *Cordis* case[2] precludes Medinol from asserting claims associated with Medinol's '303, '018, '120, '381, and '982 patents.[3] For the following reasons, Guidant's motion is granted in part and denied in part.

## I. FACTS

### A. The Parties

Medinol, which has its principal place of business in Tel Aviv, Israel, designs and manufactures coronary stents.[4] Guidant develops, markets, and sells cardiovascular medical products and has its principal place of business in Indiana. ACS has its principal place of business in California.[5]

### B. Background

At the heart of this litigation are patent rights directed to various balloon stent designs. "Stents" are "medical device[s] much like [ ] miniature scaffolding that physically hold[ ] open a diseased artery into which [they are] inserted."[6] They are "used to treat diseased blood vessels in the heart ('coronary arteries') and in other areas of the body ('peripheral arteries')."[7] Stents are introduced into the blood vessel on a balloon catheter in a procedure during which the catheter is "maneuver[ed] into the blocked artery [where the balloon is inflated, causing the stent to expand against the vessel wall].... Once the balloon has been deflated and withdrawn, the stent stays in place permanently, holding the blood vessel open and improving blood flow."[8]

### 1. Prior Art

Prior to Medinol's development of its catheter-delivered coronary stents, various patents had been issued that the parties agree are "prior art" to the asserted claims of the Medinol patents for purposes of section 103(a).[9] These patents include

---

1. At issue are the following patents, U.S. Patent Nos.: (1) 5,733,303 ("'303 Patent"); (2) 5,843,120 ("'120 Patent"); (3) 5,972,018 ("'018 Patent"); (4) 6,443,982 ("'982 Patent"); and (5) 6,461,381 ("'381 Patent") (collectively "patents-in-suit"). Specifically, Medinol alleges that Guidant has willfully infringed Medinol's patents through the alleged manufacture, use, offer for sale, sale, and/or importation of MULTI LINK PENTA® and MULTI LINK ZETA0 systems, which contain stents for implantation in human vessels. Defendants have also asserted cross-claims, which are not at issue in this motion.

2. *Scimed Life Sys., Inc. v. Johnson & Johnson*, 225 F.Supp.2d 422 (D.Del.2002), *aff'd*, 87 Fed.Appx. 729 (unpublished decision) (Fed. Cir. Jan. 14, 2004).

3. Specifically, Guidant argues that Medinol is collaterally estopped from asserting all of the claims listed in the Complaint: 24 and 28 of the '303 Patent; 13, 16, 18, 27, and 28 of the '120 Patent; 51 and 64 of the '018 Patent; 1, 2–15, and 17 of the '982 Patent; and 56–

58, 61, 63, 65–66, 68–70 of the '381 Patent. Only one of these claims was litigated in *Cordis*—claim 13 of the '120 Patent, which the jury found to be not invalid and infringed.

4. Complaint ¶ 5.

5. *Id.* ¶¶ 6–7.

6. *Scimed Life Sys., Inc.*, 87 Fed.Appx. at 730.

7. *Scimed Life Sys., Inc.*, 225 F.Supp.2d at 425.

8. Guidant, *Coronary Artery and Peripheral Vascular Disease*, Ex. 1 to 2/18/04 Declaration of Christine E. Lehman, Guidant's counsel, in Support of Guidant's Motion for Summary Judgment ("Lehman Decl."), at 13.

9. 35 U.S.C. § 103(a). This section states, in relevant part:

 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject

U.S. Patent Nos.: (1) 4,739,762 ("Palmaz '762 Patent") [assigned to Expandable Grafts P'ship];[10] (2) 5,102,417 ("Palmaz '417 Patent") [Expandable Grafts P'ship];[11] (3) 5,104,404 ("Wolff '404 Patent") [Medtronic, Inc.];[12] (4) 5,195,984 ("Palmaz–Schatz '984 Patent") [Expandable Grafts P'ship];[13] (5) 5,421,955 ("Lau '955 Patent") [ACS];[14] and (5) 5,879,370 ("Fischell '370 Patent").[15]

The origins of the modern stent trace back to the 1980s. In April 1988, a patent was issued to Palmaz for an "expandable intraluminal graft, and method and apparatus for implanting an expandable intraluminal graft," *i.e.*, a "stent," which Johnson & Johnson commercialized in 1991. The Palmaz '762 Patent described the first stent to "include a plurality of closed cells" that, upon expansion, "transformed [from slot-shaped cells] into diamond-shaped cells, resulting in an expanded stent with a honeycomb appearance."[16] At approximately the same time, in furtherance of this design, Palmaz patented a stent (Palmaz '417 Patent) "combining slot-shaped cells with flexible connectors to increase longitudinal flexibility."[17] In 1992, Wolff designed a stent for Medtronic, Inc. that uses "coil connectors" to impart flexibility (Wolff '404 Patent). In 1995, Schatz developed a new variation of the Palmaz stent, involving "straight flexible connectors between tube sections" (Palmaz–Schatz '984 Patent).[18] In the early 1990s, Guidant developed its stent design based on "connecting single serpentine rings with flexible connectors," for which it obtained the Lau '955 Patent.[19] The designs disclosed in the Lau '955 Patent "illustrate two different ways of connecting the rings, 'in-phase' or 'out-of-phase.'"[20] Guidant commercialized the "in-phase" design as the "Multi–Link stent." Finally, in 1999, the Fischell '370 Patent was issued, which discloses a stent with "'undulating,' or looped

matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Section 102 provides, in relevant part, that a person is not entitled to a patent if:

(a) the invention was known or used by others ... or patented or described in a printed publication ... before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication ... or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

[...]

(e) the invention was described in (1) an application for patent ... by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent....

10. Palmaz '762 Patent (Apr. 26, 1988) B0958. References to "B ___" are to pages in the appendix that Guidant submitted in connection with its Notice of Motion.

11. Palmaz '417 Patent (Apr. 7, 1992) B0995.

12. Wolff '404 Patent (Apr. 14, 1992) B1083.

13. Palmaz–Schatz '984 Patent (Mar. 23, 1993) B1008.

14. Lau '955 Patent (June 6, 1995) B1062.

15. Fischell '370 Patent (Mar. 9, 1999) B1053. This is a continuation of a patent application filed on February 25, 1994.

16. Guidant's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.Mem.") at 2.

17. *Id.* at 3.

18. *Id.*

19. *Id.*

20. *Id.*

connectors between rings that become circular when completely expanded."[21]

## 2. Medinol's Patents

Medinol also successfully applied for patent protection of its stent design. In 1995, U.S. Patent No. 5,449,373 ("Pinchasik '373 Patent") was issued to Pinchasik et al. and assigned to Medinol.[22] A series of stents, described as continuations or continuations-in-part of the Pinchasik '373 Patent, were invented by Henry Israel and Gregory Pinchasik and assigned to Medinol. These patents—the '303, '018, '120,- '381, and '982—describe a family of flexible, expandable stents. Specifically, the *Cordis* court noted that Medinol's patents:

> share the same drawings, and essentially the same specification, and are described as continuations of a series of applications beginning with Application Serial No. 282,181 ..., filed on July 28, 1994, and continuations-in-part of Application Serial No. 213,272 ..., which was filed on March 17, 1994, and issued as [the Pinchasik '373 Patent]. The Medinol patents generally describe and illustrate stent designs that achieve the objectives and flexibility during delivery, compensation for foreshortening, continuous uniform scaffolding, and resistance to radial deformation and collapse upon expansion.[23]

### a. The '303 Patent

The '303 Patent was issued on March 31, 1998 and contains thirty-one claims. Two

are alleged to be infringed by defendants' products—24 and 28. Claim 24 reads as follows:

> A flexible connector for connecting the apices of cells included in a stent, including: a flexible member having a first end and a second end with an area of inflection disposed between said first end and said second end, a portion of said flexible member having a width smaller than the width of said apices to which said first end and said second end are connected.[24]

Claim 28 refers to:

> An expandable stent, including:
>
> a plurality of connected cells having a longitudinal axis defining a substantially uniform structure of flexible cells having a longitudinal axis and a circumferential axis substantially perpendicular to said longitudinal axis; each of said flexible cells having apices disposed apart and generally opposite to one another along said longitudinal axis of each of said cells; each of said flexible cells having apices disposed apart and generally opposite to one another about the circumferential extension of the cell, each of said flexible links including at least two portions of an area of inflection there between.[25]

### b. The '120 Patent

Eight months after the issuance of the '303 Patent, the '120 Patent was issued. Five of the claims are asserted in this

---

21. *Id.* at 4.

22. Pinchasik '373 Patent (Sept. 12, 1995) B0968. The parties disagree as to whether the Pinchasik '373 Patent, which was abandoned subsequent to its issuance, is "prior art" to the claims asserted in this action. Medinol's Local Rule 56.1 Counterstatement to Guidant's Rule 56.1 Statement of "Undisputed Facts" ("Pl. 56.1 Stmt.") ¶ 25.

23. *Scimed Life Sys., Inc.*, 225 F.Supp.2d at 425.

24. '303 Patent, col. 10, lines 1–7.

25. *Id.*, col. 10, lines 10–11.

action—13, 16, 18, 27, and 28, which, in seriatim, state:

13. An expandable stent formed of an elongated cylindrical unitary tube suitable for insertion into a lumen or blood vessel in which it may be expanded, comprising: a plurality of first meanders extending in a first direction on the cylinder of the tube and a plurality of second meanders extending in a second direction, on the cylinder of the tube, wherein the first and second meanders are formed with loops and are interconnected such that at least one of the loops of each of the first meanders is disposed between each consecutive second meander to which the first meander is connected, and at least one of the loops of each of the second meanders is disposed between each consecutive first meander to which it is connected; the first and second meanders defining a plurality of enclosed spaces.

16. A stent according to claim 13, wherein the first and second meanders are connected together such that the loops thereof cooperate so that upon bending of the stents the loops change shape to compensate for the difference in length between the inside and outside curves.

18. A stent according to claim 13, wherein the stent can bend in any direction and in more than one direction at any time.

26. '120 Patent, col. 7, lines 13–26; col. 7, lines 41–45; col. 7–8, lines 53–55, 1–2; col. 8, lines 44–47; col. 8, lines 48–51. Claim 21 describes:
 A stent formed of a tube having a patterned shape, the patterned shape comprising:
 a. first meander patterns having axes extending in a first direction;
 b. second meander patterns having axes extending in a second direction, different than said first direction, wherein said second meander patterns intersect with said first meander patterns;

27. A stent according to claim 21 wherein said second meander patterns intersect with said first meander patterns so as to leave at least one loop of said first meander patterns between each pair of adjacent second meander patterns.

28. A stent according to claim 21 wherein said second meander patterns intersect with said first meander patterns at common members which are shared by said first and said second meander patterns.[26]

### c. The '018 Patent

The '018 Patent, issued on October 26, 1999, is comprised of sixty-four claims. Medinol is asserting claims 51 and 64, which disclose:

51. A generally longitudinally extending tubular stent which is substantially uniformly flexible with respect to its longitudinal axis, said stent consisting essentially of: a plurality of flexible cells, each having a longitudinal extension parallel to said longitudinal axis and a circumferential extension parallel to an arc of a circle around the circumference of the stent,

 (a) wherein each of said flexible cells comprises apices disposed apart and generally opposite to one another along said longitudinal extension of the cell,

 c. wherein said first meander patterns have loops;
 d. wherein said first meander patterns are spaced apart to leave a portion of said second meander patterns between each pair of adjacent first meander patterns;
 e. wherein each of said second meander patterns has at least one loop between at least one pair of adjacent first meander patterns.
*Id.* col. 8, lines 6–21.

(b) wherein each of said flexible cells comprises at least first and second flexible links, wherein prior to expansion of the stent, the first and second flexible links are disposed apart and generally opposite to one another along the circumferential extension of the cell, and

(c) wherein each of said flexible links comprises a first attachment point and a second attachment point, the first and second attachment points being on a line segment that extends substantially parallel to said longitudinal axis prior to expansion of the stent, wherein each of said flexible links has a bend in it such that the length of said flexible link is greater than the distance between said first and second attachment points, whereby the flexible link can change shape to allow the distance between the attachment points to become longer or shorter to facilitate bending of the stent.

64. A stent formed of a tube having a patterned shape, the patterned shape comprising:

a. first meander patterns having axes extending in a first direction;

b. second meander patterns having axes extending in a second direction, different than said first direction, wherein said second meander patterns intersect with said first meander patterns;

c. wherein said first meander patterns have loops;

d. wherein said first meander patterns are spaced apart to leave a portion of said second meander patterns between each pair of adjacent first meander patterns;

e. wherein each of said second meander patterns has at least one loop between at least one pair of adjacent first meander patterns, and

f. wherein at least one of said loops is provided with a width that is smaller than the width of the meander pattern on which said [*sic*] at least one of said loops is disposed.[27]

### d. The '982 Patent

On September 3, 2002, the Patent and Trademark Office ("PTO") issued the '982 Patent. Claims 1, 2–15, and 17 read as follows:

1. An expandable stent for supporting a vessel, wherein in the expanded and deployed state, the stent consists of:

(a) first meander patterns having loops, the first meander patterns being longitudinally spaced from each other and having axes extending in a first direction; and

(b) second meander patterns having loops, the second meander patterns having axes extending in a second direction, different than the first direction,

(c) wherein the first and second meander patterns are interconnected to form a tubular structure;

(d) wherein the first meander patterns are connected to the second meander patterns so as to leave at least one loop of each of the second meander patterns in the space between each pair of adjacent first meander patterns; and

(e) wherein the second meander patterns are connected to the first meander patterns so as to leave no more than two loops of each of the first meander patterns between each pair of adjacent second meander patterns.

---

27. '018 Patent, col. 13, lines 4–48; col. 18, lines 10–31.

2. The stent according to claim 1, wherein the shape and placement of the loops provides radial strength to the expanded stent to hold the vessel open.

3. The stent according to claim 2, wherein the first direction extends in a circumferential direction.

4. The stent according to claim 3, wherein the second direction extends in a longitudinal direction.

5. The stent according to claim 2, wherein the second direction extends in a longitudinal direction.

6. The stent according to claim 1, wherein the stent defines a plurality of enclosed spaces, with each longitudinal end of each of the enclosed spaces being formed by one or more loops of the first meander pattern.

7. The stent according to claim 6, wherein the enclosed spaces are substantially the same size.

8. The stent according to claim 7, wherein the first direction extends in a circumferential, direction.

9. The stent according to claim 8, wherein the second direction extends in a longitudinal direction.

10. The stent according to claim 7, wherein the second direction extends in a longitudinal direction.

11. The stent according to claim 6, wherein the first direction extends in a circumferential direction.

12. The stent according to claim 11, wherein the second direction extends in a longitudinal direction.

13. The stent according to claim 6, wherein the second direction extends in a longitudinal direction.

14. The stent according to claim 1, wherein the first direction extends in a circumferential direction.

15. The stent according to claim 14, wherein the second direction extends in a longitudinal direction.

17. The stent according to claim 1 wherein the second direction extends in a longitudinal direction.[28]

### e. The '381 Patent

In October 2002, the '381 Patent was issued. Claims 56–58, 61, 63, 65–66, and 68–70, asserted herein, recite:

56. A balloon expandable stent for implantation into a lumen to support the lumen, said stent both in the unexpanded state and in the balloon-expanded state including: a plurality of flexible cells adjacent to one another both circumferentially and longitudinally each of said flexible cells comprising:

a) a first flexible link including an arc, the first flexible link having a first longitudinal end and a second longitudinal end;

b) a second flexible link including an arc, the second flexible link having a first longitudinal end and a second longitudinal end;

c) a first circumferential member disposed between said first longitudinal end of said first flexible link and said first longitudinal end of said second flexible link and;

d) a second circumferential member disposed between said second longitudinal end of said first flexible link and said second longitudinal end of said second flexible link,

e) at least one of said first circumferential member and said second circumferential member in each of said cells having a portion with a substantial longitudinal component that is also a portion with a substantial longitudinal component of a first circum-

---

28. '982 Patent, col. 6, lines 29–67; col. 7, lines 1–11, 14–15.

ferential member or a second circumferential member in a longitudinally adjacent cell,

wherein in the expanded state the first and second circumferential members have a substantial longitudinal component to provide coverage of the lumen.

57. A stent according to claim 56, wherein in the unexpanded state, a radial plane perpendicular to a longitudinal axis can pass through the flexible links of the flexible cells and not pass through the circumferential members.

58. A stent according to claim 56 wherein each of said first and second flexible links has ends generally aligned with respect to each other along a longitudinal axis of the stent.

61. A stent according to claim 56, wherein the first members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops and the second members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops.

63. A stent according to claim 56 wherein said plurality of flexible cells provide substantially all the support for said stent.

68. A stent according to claim 65, wherein the first members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops and the second members of circumferentially adjacent cells are connected in a closed circumferential structure which contains at least five loops.

69. A stent according to claim 65 wherein each of said first and second flexible links has ends generally aligned with respect to each other along a longitudinal axis of the stent.

70. A stent according to claim 65 wherein said plurality of flexible cells provide substantially all the support for said stent.[29]

### C. *Cordis* Litigation

In December 1999, Medinol and its licensee, Scimed Life Systems, Inc. ("Scimed") (collectively "plaintiffs"), filed a patent infringement action in the district of Delaware, alleging that Cordis Corp. ("Cordis"), Johnson & Johnson, and Johnson & Johnson Interventional Systems, Inc. had infringed certain claims of Medinol's '303, '120, and '018 patents.[30] Medinol argued that defendants' (1) BX Velocity stent,[31] (2) Crown and Mini–Crown stents,[32] and (3) Corinthian stent[33] infringed specified claims in its patents. After a

---

**29.** '381 Patent, col. 9–10, lines 56–67, 1–18; col. 10, lines 19–22; col. 10, lines 23–25; col. 10, lines 26–27; col. 10, lines 30–35; col. 10, lines 38–40.

**30.** In *Cordis*, Medinol asserted claims 12 of the '303 Patent; 13 of the '120 Patent; and 35, 47, and 60 of the '018 Patent.

**31.** The BX Velocity stent is "composed of closed flexible cells, each of which has opposing horizontal loops connected by flexible N-shaped regions. When the BX Velocity stent is expanded, the 'N-regions' lengthen to compensate for the shortening of the stent." *Scimed Life Sys., Inc.*, 225 F.Supp.2d at 430.

**32.** The Crown and Mini–Crown stents are "composed of a series of serpentine-ring structures which are fused together." *Id.* at 431. The "Mini–Crown is based on the design of the Crown stent, but is scaled to treat coronary arteries with a smaller diameter." *Id.*

**33.** The Corinthian stent "has a similar structure to the Crown stent, but is larger and is used in the biliary system and other peripheral arteries rather than in coronary vessels." *Id.* at 432.

two-week jury trial on the issues of infringement and invalidity, the jury returned the following verdict:

(1) BX Velocity Stent

 (a) Claims 35, 47 and 60 of the '018 patent: no literal infringement; no infringement under the doctrine of equivalents; did not address the reverse doctrine of equivalents

 (b) Claim 12 of the '303 patent: no infringement under the doctrine of equivalents.

(2) Crown and Mini–Crown Stents

 (a) Claim 13 of the '120 patent: no literal infringement

(3) Corinthian Stent

 (a) Claim 13 of the '120 patent: literal infringement [34]

The jury determined that all of the asserted claims were invalid for obviousness and failure to comply with the written description requirement, except for claim 13 of the '120 Patent. The jury found defendants' infringement of claim 13 through the sale and manufacture of the Corinthian stent to be nonwillful and awarded plaintiffs approximately eight million dollars in damages.[35]

Medinol and Scimed then moved for judgment as a matter of law ("JMOL") and for a new trial under Rule 59(a).[36] Plaintiffs' motion was granted in part and denied in part. The court denied plaintiffs' motion as to infringement by the BX Velocity stent and the Crown and Mini–Crown stents.[37] The court also rejected plaintiffs' argument that the asserted claims of the '303 and '018 patents are not invalid for obviousness, finding that "defendants presented substantial evidence to support a reasonable jury's conclusion that claims 12, 35, 47 and 60 would have been obvious to one of ordinary skill in the art in July 1994, the time the inventions described in those claims were made." [38] However, finding that defendants failed to present clear and convincing evidence such that a reasonable jury could conclude that the claims are invalid for failure to comply with the written description requirement, the court granted plaintiffs' motion for JMOL as to the "invalidity of claims 12, 35, 47, and 60 [of the '303 and '018 patents] based on failure to comply with the written description requirement." [39]

Significantly, the court rejected plaintiffs' argument that they were entitled to a

---

**34.** *Id.* at 432–33; Jury Verdict B0001.

**35.** *See Scimed Life Sys., Inc.,* 225 F.Supp.2d at 433.

**36.** To prevail on a renewed motion for JMOL after a jury trial, the movant must demonstrate that the jury's findings, " 'presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.' " *Id.* (quoting *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1348 (Fed.Cir.1998)).

 The "decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining [JMOL], the court need not view the evidence in the light most favorable to the verdict winner." *Id.* "The court should grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." *Id.* at 434.

**37.** With respect to infringement by the BX Velocity stent, the court found that, based on the record, "the jury could have found that the BX Velocity stent does not infringe claim 47 of the '018 patent because it does not contain the 'flexible compensating member or flexible link' limitation or the 'substantially uniformly flexible' limitation." *Id.* at 438. As for the Crown and Mini–Crown stents, the court concluded that "substantial evidence supports the jury's verdict that the Crown and Mini–Crown stents did not infringe claim 13 of the '120 patent." *Id.*

**38.** *Id.* at 440.

**39.** *Id.* at 439.

new trial based on an inconsistent jury verdict on obviousness. As the court explained:

> Claim 13 of the '120 patent has an additional limitation, i.e., that the stent must have "at least one of the loops of each of the first meanders disposed between each consecutive second meander to which the first meander is connected" over claim 60 of the '018 patent. This supports the jury's verdict that claim 13 is not invalid for obviousness whereas claim 60 is invalid.[40]

■ Medinol and Scimed then unsuccessfully appealed the denial of their post-trial motions to the Federal Circuit, which held that "there was substantial evidence in the record to support the conclusion that the asserted claims of the '303 and '018 patents were obvious over the prior art at the time they were filed with the PTO."[41] Specifically, the Federal Circuit cited the testimony of Cordis's trial expert, Dr. Nigel Buller, as evidence of the existence of compensation for foreshortening in the prior art. Dr. Buller testified that stents constructed from combinations of rings and flexible connectors, "as required by the asserted claims of the '303 and '018 patents, were in the prior art."[42] In response to plaintiffs' argument that "even if each of the elements of the asserted claims was in the prior art, the record does not demonstrate that there was a motivation to combine" them, the Federal Circuit identified portions of the record that indicated that there was substantial evidence that "a person of ordinary skill in the art did, in fact, combine the elements of the stent design claimed by the '303 and '018 patents prior to July 28, 1994."[43] In particular, the court noted that Paul Burmeister, a Scimed engineer, had "evaluated the concept of a hybrid stent that would partially self-expand and then fully expand with a balloon."[44] He filed a patent application on May 19, 1994, containing the design aspects of the stents claimed in the '303 and '018 patents. Although he subsequently abandoned the design, the court found:

> The jury had before it expert testimony that a person of ordinary skill in the art, on July 28, 1994, would inspect the drawings of the Burmeister application and conclude it disclosed a stent design that combined the claimed elements of the balloon expandable stent design taught by the patents-in-suit. This was legally sufficient evidence from which the jury could have found a motivation to combine in the knowledge of one of ordinary skill in the art, a finding of fact we must presume the jury to have made given that it returned a verdict on the validity issue in favor of Cordis.[45]

## II. APPLICABLE LAW

### A. Governing Law

■ As a general principle, Federal Circuit precedent governs issues of patent

---

40. *Id.* at 441 n. 5.

41. *Scimed Life Sys., Inc.,* 87 Fed.Appx. at 735. As the Federal Circuit explained, the appellate court reviews a denial of a motion for JMOL by reapplying the district court's standard of review and the denial of a motion for a new trial for abuse of discretion. *See id.* at 733.

42. *Id.*

43. *Id.* at 735. The parties agreed that this was the operative date for purposes of invalidity because it is the "filing date of a priority document common to each of the [*Cordis*] patents-in-suit." *Id.* at 730. That is, each of the patents disputed in *Cordis* were filed as continuations of an earlier patent, dated July 28, 1994.

44. *Id.* at 735 (quotation marks and citation omitted).

45. *Id.* at 736.

law, while the law of the regional circuit applies to nonpatent matters.[46] In the field of collateral estoppel, the Federal Circuit has explained that the "[a]pplication of *Blonder–Tongue*[47] [is] an issue of patent law [and is therefore] ... subject to [Federal Circuit law]."[48] However, application of general collateral estoppel principles, such as finality of judgment, is not within the exclusive jurisdiction of the Federal Circuit, and, as such, is governed by the law of the regional circuit.[49]

## B. Standard for Summary Judgment

▮▮▮ Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[50] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[51] A fact is material when "it 'might affect the outcome of the suit under the governing law.'"[52] The movant has the burden of demonstrating that no genuine issue of material fact exists.[53] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[54] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[55] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.[56]

## C. Standard for Collateral Estoppel

### 1. General Principles

▮▮▮ Under the doctrine of collateral estoppel, or issue preclusion, a final

---

46. See *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed.Cir.1999); see also *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed.Cir.2003).

47. *Blonder–Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

48. *Pharmacia & Upjohn v. Mylan Pharmaceuticals*, 170 F.3d 1373, 1381 n. 4 (Fed.Cir. 1999). "In the patent infringement context, the legal standard for determining whether a patentee is collaterally estopped from asserting its alleged patent right was established by the Supreme Court in *Blonder–Tongue.*" *Id.* at 1379. The Supreme Court ruled that "once the claims of a patent are held invalid in a suit involving one alleged infringer, an unrelated party who is sued for infringement of those claims may reap the benefit of the invalidity decision under principles of collateral estoppel." *Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1577 (Fed.Cir.1994) (describing *Blonder–Tongue* ).

49. See *Pharmacia & Upjohn*, 170 F.3d at 1381 n. 4.

50. Fed.R.Civ.P. 56(c).

51. *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

52. *Id.* (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

53. See *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

54. *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

55. *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998)); see also *Gayle*, 313 F.3d at 682.

56. See *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir.2003).

judgment on the merits in a prior proceeding precludes relitigation of those issues that were actually litigated and determined in the first suit, "regardless of whether the two suits are based on the same cause of action."[57] "The purpose of the doctrine is to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.' "[58]

To prevail on a motion for summary judgment premised on collateral estoppel, the movant must satisfy the following elements: (1) the issues presented in the instant action are identical to those involved in the prior action; (2) the issues were actually litigated and decided in the prior action; (3) the estopped party had a full and fair opportunity to litigate the issues in the prior action; and (4) resolution of the issues was necessary to the final judgment.[59] The movant bears the burden of demonstrating that the identical issue was decided in the prior proceeding, while the party against whom the "collateral estoppel is asserted bears the burden of showing the absence of a fair and full opportunity to litigate."[60]

## 2. Collateral Estoppel in the Context of Patent Invalidity and Infringement

In the field of patent law, the Federal Circuit has counseled that collateral estoppel may apply to patent claims that were not previously adjudicated, because the "issues litigated, *not* the specific claims around which the issues were framed" are determinative.[61] The rationale for this principle was explained by the *Bourns* court. There, the Court of Claims noted first that "[t]here is no reason to employ a different approach in a patent context by looking to the claims litigated instead of to the issues that were decided."[62] The court next observed that because claims in patents are routinely "repeated and duplicated, varying one from the other only in certain minor details,"[63] it is unsurprising that each of these "differently worded claims may present identical issues."[64] "The realities of patent practice suggest that, merely because the invention, the patentee's contribution to the art, is presented in varying language or varying combinations of elements does not necessarily mean that the issues bearing on the nonobviousness of that concept or contribution vary from one claim to the next."[65] Accordingly, application of collateral estoppel in the context of patent validity is premised on the identity of those issues that were previously litigated.[66]

---

57. *Postlewaite v. McGraw–Hill*, 333 F.3d 42, 48 (2d Cir.2003); *see also Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir.2001).

58. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1568 (Fed.Cir. 1996) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).

59. *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995).

60. *Russell–Newman, Inc. v. Robeworks, Inc.*, No. 00 Civ. 9797, 2002 WL 1918325, at *3 (S.D.N.Y. Aug.19, 2002).

61. *Westwood Chem., Inc. v. United States*, 207 Ct.Cl. 791, 525 F.2d 1367, 1372 (1975) (em-

phasis added); *see also Bourns v. United States*, 210 Ct.Cl. 642, 537 F.2d 486, 491 (1976).

62. *Bourns*, 537 F.2d at 491.

63. *Id.*

64. *Id.* at 492.

65. *Id.*

66. *See id.* ("[I]f a patentee has [ ] been heard on all the factual issues necessary to an obviousness determination, and that determination already has been made adversely to one claim, neither due process nor any provision of the patent statute ... require that the pat-

"Where obviousness is the basis for the prior invalidity holding, an inquiry into the identity of the validity issue is [ ] properly phrased in terms of the factual inquiries mandated by *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). . . ."[67] As the *Westwood* court explained, the inquiry is:

> whether the nonlitigated claims present new issues as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to that level of ordinary skill in that art. If none of these inquiries raises any new triable issues, then the obviousness determination in the prior proceeding should be equally applicable to the nonlitigated claims.[68]

The Court of Claims counseled that a court applying this standard should first compare the adjudicated and unadjudicated claims. If the scope of these claims is identical, then there are no new issues relating to the obviousness determination raised as to the nonlitigated claims.[69] But, if this claim comparison reveals a substantive difference:

> it will be necessary to go a step further and determine whether those differences

are of a kind that would have been itemized in a *Graham* analysis as a difference between the claim and the prior art, or whether it was known in the prior art and is only a part of the claimed combination as a whole that provides the context in which the obviousness determination is made. If it is only of the latter character, *i.e.*, it is known in the prior art and does not alter the issue as to the differences between the claimed subject matter and the prior art, it is still necessary to assess the importance of the difference to the combination as a whole since it is from that standpoint that the obviousness determination must be made.[70]

Although the "practicalities are to look to the distinguishing features incorporated into the claims and the validity determination necessarily focuses on those features," the "subject matter of the claim must be considered as a whole."[71] Indeed, *Bourns* teaches that where the nonmovant effectively argues that the additional elements distinguish the claimed combination as a whole from the prior art, it is not enough for a movant to show that those elements are disclosed in the prior art.[72] It is only

---

entee be heard once again on those same issues and on the same obviousness determination simply because a different claim is involved.").

**67.** *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1136 (Fed.Cir.1985) (quoting *Westwood Chem.*, 525 F.2d at 1375).

**68.** *Westwood Chem.*, 525 F.2d at 1375.

**69.** *See id.* The U.S. Court of Claims is the predecessor court of the Federal Circuit, which has adopted as precedent the decisions of the Court of Claims and the Court of Customs and Patent Appeals. *See Interconnect Planning*, 774 F.2d at 1136 n. 2.

**70.** *Westwood Chem.*, 525 F.2d at 1375. Importantly, it is erroneous to compare a "successively narrower claim ... with the one

before it, [and] not with the prior art." *Interconnect Planning*, 774 F.2d at 1137 (quoting *Bourns*, 537 F.2d at 493).

**71.** *Bourns*, 537 F.2d at 494.

**72.** Specifically, the *Bourns* court emphasized that "plaintiffs [did] not contest [that the features are of no importance to the combination as a whole], offering not one word that suggests that either of those features contributed in any way to any of the stated objects of the patent, or that they are in any way important to the combination set forth in the claims in which they appear." *Id.* at 493–94; *see also id.* at 494 ("Where, as here, the distinguishing features of the adjudicated and unadjudicated claims appear to be the same, and neither the text of the patent nor the plaintiffs here attribute any importance or significance to the ad-

where the claim comparison "indicates that the additional elements recited in the unadjudicated claims do not distinguish the *claimed combination as a whole* from the prior art," [73] that those newly asserted claims may not be litigated in a subsequent proceeding.

## III. DISCUSSION

As an initial matter, Medinol argues that Guidant cannot prevail on its motion because of the *Cordis* jury's determination that claim 13 of the '120 Patent is "valid." [74] Medinol summarizes Guidant's arguments with respect to claim 13 of the '120 Patent as follows:

> Guidant contends that the Cordis jury's factual findings, as inferred from the jury's verdicts of invalidity with respect to Claim 60 of the '018 patent and Claim 12 of the '303 patent establish that claim 13 of the '120 Patent is *invalid.* This cannot be. Either Guidant's arguments about the jury's factual findings are

wrong, or the jury's verdicts are inconsistent. [75]

Medinol submits that Guidant "itself argues that the factual findings it seeks to infer from the jury's verdicts as to claim 60 of the '018 Patent and claim 12 of the '303 Patent cannot be reconciled with the jury's verdict of validity with respect to claim 13 of the '120 Patent." [76] The implication is that the verdict is inconsistent, which, Medinol argues, means that it can have no preclusive effect. [77]

Guidant counters that Medinol "had a full and fair opportunity to litigate the consistency of the *Cordis* verdict, and pursued that opportunity with vigor. Those efforts, however, failed to prove that the judgment is so suspect as to prevent application of collateral estoppel." [78] Claim 13 does not bar collateral estoppel because, according to Guidant, the *Cordis* jury did not find claim 13 "valid." Rather, it found that claim 13 was "not invalid" and infringed. [79]

---

ditional elements included in the unadjudicated claims, it is difficult to justify a further trial merely because of the presence of those elements in the claims.").

**73.** *Id.* at 493 (emphasis added).

**74.** Medinol's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Opp.") at 2–3. Notably, the *only* claim common to the *Cordis* litigation and this action is claim 13 of the '120 Patent.

**75.** *Id.* at 4.

**76.** *Id.* at 5 (citing Def. Mem. at 1 n. 1, 9 n. 8, 16–18).

**77.** *See id.* (citing *United States v. Citron*, 853 F.2d 1055 (2d Cir.1988), and *Harary v. Blumenthal*, 555 F.2d 1113 (2d Cir.1977)). Support for Medinol's position is premised on courts' refusals to apply collateral estoppel due to inconsistent or compromise verdicts rendered in *criminal* cases. But, as Guidant notes, Medinol's reliance on these cases is

misplaced, as "[t]he Supreme Court has specifically distinguished the applicable collateral estoppel principles in criminal and civil contexts." Guidant's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment ("Def.Reply") at 9 n. 6 (citing *Standefer v. United States*, 447 U.S. 10, 22, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), where the Court "refus[ed] to apply collateral estoppel to a compromise acquittal, because, unlike in civil cases appellate review was not available").

**78.** Def. Reply at 1.

**79.** *Id.* at 9. Interestingly, in *Cordis*, the trial court stated that "[t]he jury found all of the asserted claims invalid for both obviousness and failure to comply with the written description requirement except for claim 13 of the '120 patent, which the jury determined is *valid.*" *Scimed Life Sys. Inc.*, 225 F.Supp.2d at 433 (emphasis added). However, the Federal Circuit described the verdict as finding claim 13 "not invalid and literally infringed." *Scimed Life Sys, Inc.*, 87 Fed.Appx. at 730.

The *Cordis* jury's finding as to claim 13 does not prevent the application of collateral estoppel to *all* of the issues raised herein because there is insufficient evidence suggesting that the verdict *is* inconsistent. Medinol already unsuccessfully attacked the jury verdict on this basis, arguing that:

> [b]oth [claim 13 of the '120 Patent and claim 60 of the '018 Patent] describe the invention in terms of meander patterns and have nearly the same scope. Both require first and second intersecting meander patterns oriented in two different directions with loops, and both require at least one loop on the second meander pattern between two consecutive first meander patterns which it connects.[80]

The district court rejected this argument, noting that the verdict was *not* inconsistent because claim 13 has the additional limitation of "at least one of the loops of each of the first meanders disposed between each consecutive second meander to which the first meander is connected."[81] The existence of this feature easily distinguishes claim 13 from invalid claim 60, undermining the argument that the jury rendered an inconsistent verdict.

■ Moreover, because the *Cordis* defendants failed to prove the invalidity of the combination containing this element, it would defy logic to preclude Medinol from asserting claims disclosing this limitation.[82] Thus, Medinol is not estopped from litigating the validity and alleged infringement of claims 27, 13, and dependent claims 16 and 18 of the '120 Patent, as well as claim 1 and dependent claims 2–15 and 17 of the '982 Patent.

As for those claims that do not contain this limitation (one of the loops of each of the first meanders disposed between each consecutive second meander), the primary questions raised by Guidant's motion are exceeding the scope of the collateral estoppel motion. Indeed, Guidant's request seems antithetical to its motion. The premise of collateral estoppel is that a party should be barred from relitigating issues already decided in a prior proceeding. However, the *Cordis* jury decided that claim 13 was not invalid and infringed. Thus, Guidant is essentially asking this Court to both declare claim 13 invalid, despite the jury's verdict to the contrary, and at the same time, to accord the *Cordis* decision preclusive effect. Logically, these arguments are inconsistent.

Moreover, the factual record of this case is insufficiently developed for the Court to reach such a conclusion. As Medinol points out, Guidant first asked for this relief in its reply brief and it would be "fundamentally unfair to Medinol [to] consider Guidant's request for summary judgment on the merits without giving Medinol an opportunity to submit evidence, including expert testimony, that demonstrates that the material facts pertinent to Guidant's obviousness defense are in dispute." 4/19/04 Letter to the Court from Keith R. Hummel, Medinol's Counsel ("4/19 Pl. Ltr.") at 2. Accordingly, Guidant's request that this Court find claim 13 invalid as a

---

Thus, the record strongly suggests that the jury did not find claim 13 "valid," but "not invalid" due to defendants' failure to meet their evidentiary burden. *See* Jury Verdict B0006; *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 710 (Fed.Cir.1983) (noting that there is no such thing as a "validity" verdict).

80. Plaintiffs' Opening Brief in Support of Their Renewed Motion for JMOL and Motion for a New Trial at B0429.

81. *Scimed Life Sys., Inc.*, 225 F.Supp.2d at 441 n. 5. Medinol and Scimed also unsuccessfully raised this argument on appeal.

82. Additionally, Guidant requests that *this* Court determine as a matter of law that claim 13 is invalid for obviousness based on the findings in *Cordis*. *See id.* ("[T]here is clear evidence of record that permits this Court to find claim 13 invalid as obvious as a matter of law without regard to collateral estoppel.... The legal question of claim 13's invalidity can and should be resolved without further delay."). But this would require the Court to assess whether summary judgment *on the merits* of claim 13 is warranted, an inquiry

whether the issues presented here: (1) were actually litigated and decided in the prior action and (2) are substantially identical to those involved in the prior litigation. Medinol does not seriously contend that it lacked a full and fair opportunity to litigate the issues in the *Cordis* action or that the resolution of the issues of invalidity was unnecessary to the final judgment.

### A. Were the Issues Raised Here Actually Litigated and Decided by the *Cordis* Jury?

 The usual practice when the defense of estoppel is raised is for the "court [to] first consider whether the issue of invalidity common to each action is substantially identical and whether in the earlier suit the patentee had had a full and fair opportunity to litigate the issue of invalidity." [83] However, because Medinol challenges Guidant's motion for being "founded on a false premise: that all of the facts that Cordis alleged were 'necessarily determined by the jury,' " [84] for purposes of this motion, I will first evaluate whether the relevant issues were "actually decided" by the *Cordis* jury.

Medinol submits that where "a party seeks to apply collateral estoppel to facts underlying a jury verdict, it must show that an element of the jury's verdict 'would have necessitated a finding [of those

facts].' " [85] In particular, Medinol asserts that the jury's verdict as to claim 13 demonstrates its failure to find all facts "relevant to obviousness in accordance with the arguments advanced by Cordis" because if it had determined that there was a general motivation to combine serpentine rings and flexible connectors, the jury would have found claim 13 invalid. [86] Thus, the jury either rendered an inconsistent verdict or it did not accept all of Cordis's arguments as to the prior art.

Medinol also argues that "Guidant cannot point to any element of the jury's obviousness determinations that necessitated a finding that *all* the prior art cited by Cordis teaches what Cordis argued it taught and that there was a general motivation to combine *all* of that art." [87] Accordingly, Medinol submits the *Cordis* jury's verdict could have been premised on only a small portion of that art.

Medinol's argument lacks merit for at least two reasons. *First,* Guidant seeks collateral estoppel with respect to the *Cordis* jury's *finding of obviousness* regarding claims 12, 35, 47, and 60. It is undisputed that the jury found that every element of those claims is disclosed in the prior art and that motivation existed for a person of ordinary skill in the art to combine the limitations disclosed in these claims. [88] Be-

---

matter of law, without regard to collateral estoppel, is denied.

**83.** *Carter–Wallace, Inc. v. United States*, 204 Ct.Cl. 341, 496 F.2d 535, 538 (1974).

**84.** Pl. Opp. at 1.

**85.** *Id.* at 7 (quoting *Hemphill v. Schott*, 141 F.3d 412, 415 (2d Cir.1998) (emphasis omitted). *Hemphill* is clearly distinguishable, as it involved the application of collateral estoppel to issues previously determined in a *criminal* case. There, the court noted that it would "accept only those facts the jury necessarily determined in returning his conviction.... While a plaintiff may be estopped in a civil

case from relitigating issues previously determined in a criminal case, such estoppel extends only to questions distinctly put in issue and directly determined in the criminal prosecution." *Id.* at 415 (quotation marks and citations omitted).

**86.** Pl. Opp. at 9.

**87.** *Id.*

**88.** Def. Reply at 5. Guidant notes that "one need look no further than the jury verdict and the Federal Circuit's decision to reject Medinol's argument," because the verdict indicates that claims 12, 35, 47, and 60 were found

cause it is the finding of obviousness over the prior art that forms the basis of this collateral estoppel motion, the (non-patent) cases upon which Medinol relies, including *In re Bogdanovich*[89] and *Local 32B–32J, Service Employees International Union v. Port Authority*[90] are distinguishable.[91]

For example, in *Bogdanovich*, the appellants were seeking to reinstate a stay preventing the plaintiffs from enforcing a general verdict rendered by a California jury premised on either oppression, fraud, or malice.[92] In addressing the weight *California* law accords a general jury verdict, the *Bogdanovich* court discussed *Bender v. Tobman*.[93] The *Bender* court ruled that where the jury returned a verdict of liability on the basis of fraudulent inducement, but made no specific findings as to which statement was fraudulent, the jury had not actually decided that the debtor had committed fraud cognizable under section 523(a)(2)(A).[94]

There is a clear difference between these bankruptcy cases and the instant action. The key issue in those cases was not whether the finding of fraudulent inducement should apply in the second proceeding, but whether any of the various underlying statements presented to the jury constituted fraud under the Bankruptcy Code. Conversely, the principal inquiry here is whether the finding of obvi-

ousness as to particular claims should be accorded preclusive effect.

*Local 32B–32J* is similarly distinguishable. In *Local 32B–32J*, this Court noted that "[t]he verdict did not specify whether [the finding of liability based on a violation of First Amendment rights] was based upon the [Port Authority's] written rules, the unwritten practices, or both.... Because it cannot be determined what acts the jury found to be violative of the Constitution, different findings of fact are not precluded by collateral estoppel."[95] Thus, the operative issue was not the preclusive effect of the jury's verdict, but whether the court could make "different" findings of fact that, in the end, were *"entirely consistent* with those of the jury."[96] Moreover, as in *Bogdanovich*, the question before the court was different from the one presented here. The inquiry in *Local 32B–32J* centered on the preclusive effect of the various factual contentions presented to the jury, rather than the jury's *finding* of liability. Accordingly, neither *Bogdanovich* nor *Local 32B–32J* suggests that issue preclusion cannot apply to the *Cordis* jury's finding of obviousness.

*Second,* although in general "there is no 'different' law of collateral estoppel for patent cases,"[97] patent cases undoubtedly raise unique concerns. The Supreme Court has described several economic con-

---

obvious and the Federal Circuit "held that the jury necessarily and properly found that (1) each and every element of those claims is found in the prior art; and (2) that there is a motivation to combine these elements." *Id.* at 4.

**89.** 292 F.3d 104, 111–12 (2d Cir.2002).

**90.** 3 F.Supp.2d 413, 416 (S.D.N.Y.1998).

**91.** Medinol also cites *Hemphill*, 141 F.3d at 415. *See* Pl. Opp. at 7. But *Hemphill* is distinguishable, as discussed above. *See supra* note 85.

**92.** 292 F.3d at 109.

**93.** 107 B.R. 20 (S.D.N.Y.1989).

**94.** *Bogdanovich,* 292 F.3d at 111–12.

**95.** 3 F.Supp.2d at 416.

**96.** *Id.* (emphasis added).

**97.** 4/19 Pl. Ltr. at 3. Although the law of the regional circuit does apply to general collateral estoppel principles, the Federal Circuit law governs the application of *Blonder–Tongue. See supra* notes 47–48 and accompanying text.

siderations relating to the costly relitigation of patent validity issues.[98] If estoppel is denied because multiple prior art references support the jury's finding of invalidity for obviousness, the implication will be that a jury verdict could *only* be accorded preclusive effect if the verdict rests on a single prior art reference. But, as Guidant points out, "[this theory] would require a full-blown obviousness analysis of every claim element, forcing a wasteful relitigation of every facet of obviousness regarding an invention that has already had its day in court." [99] The test articulated by *Westwood, Bourns,* and *Interconnect Planning* does not require this, and there is no basis for imposing it upon Guidant.

---

**98.** *See Blonder–Tongue,* 402 U.S. at 335–48, 91 S.Ct. 1434.

**99.** Def. Reply at 2–3. I note, however, that this motion seriously implicates the concerns expressed by the *Westwood* court, namely that:

> in all but the simplest case of a subsequent suit involving identical claims, any potential savings in time, both for the parties and the court, can be easily consumed, as in this case, by the motions, hearings, and briefs needed to evaluate and compare the issues raised by the claims. Naturally, if the estoppel is ultimately determined to be inapplicable to the unlitigated claims, the parties must proceed to trial and the total experience is a proceeding far lengthier than even the normally protracted patent case. This is not to say that in a case such as this, with multiple patents having both adjudicated and nonadjudicated claims, that an inquiry into the applicability of collateral estoppel, including a limited hearing for ascertaining the facts and avoiding duplicitous litigation, should not be held. There is a danger, however, where nonlitigated claims in a relatively complex technology are involved, that inquiry into the estoppel may just as easily perpetuate protracted litigation as eliminate it and it may well be as convenient to address the issues of validity on their merits.

525 F.2d at 1372 n. 8.

## B. Are the Issues Presented Here Substantially Identical to Those Previously Litigated? (Application of the *Graham* Factors)

### 1. Scope and Content of Prior Art

Guidant relies on the prior art references employed in the *Cordis* litigation, contending that the "scope and content of the prior art is exactly the same." [100] Medinol does not dispute that the Lau '955, Palmaz '417, Wolff '404, and Fischell '370 patents are prior art to the asserted claims of the patents-in-suit.[101] Instead, Medinol argues that using the *Cordis* prior art presumes that the jury relied on *all* the prior art references and made particular findings as to the "teachings" of those references.[102] Specifically,

---

**100.** Def. Reply at 10.

**101.** *See* Pl. 56.1 Stmt. ¶¶ 20 (Lau '955 Patent), 16 (Palmaz '417 Patent), 22 (Wolff '404 Patent), 23 (Fischell '370 Patent).

**102.** Pl. Opp. at 7; *see also id.* at 12 (rejecting Guidant's Claim Comparison, Ex. 5 to Lehman Decl.). Medinol's arguments relating to Guidant's burden to demonstrate those facts that were actually decided by the jury are addressed in Part III.A.

Medinol contends that the Pinchasik '373 Patent is not prior art as to the asserted claims of the patents-in-suit, which are continuations or continuations-in-part of the application that led to the Pinchasik '373 Patent. But, in its brief submitted to the Federal Circuit for purposes of the *Cordis* appeal, Medinol clearly stated that "[t]he '373 patent is prior art to the patents-in-suit under § 102(e)." Brief of Plaintiff–Appellant Medinol Ltd. at B0761. Although Medinol now asserts that this statement is irrelevant for purposes of this instant motion as it was made "with respect to the *claims* that were being argued with respect to the Federal Circuit," Transcript of April 14, 2004 Oral Argument ("Tr.") at 19 (Hummel statement), the language of the statement belies this interpretation. The Pinchasik '373 Patent is prior art to all of the *Cordis* patents-in-suit, and accordingly to all of the patents disputed herein, except for the '982 and '381 patents.

Guidant has not demonstrated that the jury " 'necessarily decided' that there was a motivation to combine [any of these patents] with any other reference, because the jury could have reached its obviousness verdicts using a combination that *did not* include each of these references." [103] However, as discussed in the preceding section, this argument lacks merit. Accordingly, the Pinchasik '373, Lau '955, Palmaz '417, Wolff '404, and Fischell '370 references are considered to be prior art for purposes of this motion.

### 2. Level of Ordinary Skill in the Art

For purposes of this motion, the definition of one of "ordinary skill in the art" is borrowed from the *Cordis* proceedings. Thus, one of ordinary skill in the art is assumed to be "an engineer working with a physician" or a "stent design team," who are presumed to know all of the relevant prior art.[104] Neither party argues, nor is there any basis for concluding, that the inquiry into the differences between the level of ordinary skill in the art raises any new triable issues.

### 3. Claim Comparison

As the claims asserted in this action are not of "identical scope" as those litigated in *Cordis*, the differences between the claims in light of the prior art must be evaluated to determine whether the newly asserted claims are nevertheless substantially identical to the invalid claims. Guidant suggests comparison of the following claims:[105]

| GUIDANT'S CLAIM COMPARISON | |
|---|---|
| *NEWLY ASSERTED CLAIM ("CL.")* | *ADJUDICATED [INVALID] CL.* |
| Cl. 24 of '303 Patent | Cl. 47 of '018 Patent |
| Cl. 28 of '303 Patent | Cl. 47 of '018 Patent |
| Cl. 51 of '018 Patent | Cl. 47 of '018 Patent |
| Cl. 64 of '018 Patent | Cl. 60 of '018 Patent |
| Cl. 28 of '120 Patent (*depends on Cl. 21* ) | Cl. 60 of '018 Patent |
| Cl. 56 of '381 Patent | Cl. 12 of '303 Patent (*depends on Cl. 6* ) |
| Cls. 57, 58, 61, 63 of '381 Patent (*depend on Cl. 56* ) | Cl. 12 of '303 Patent (*depends on Cl. 6* ) |
| Cl. 65 of '381 Patent | Cl. 12 of '303 Patent (*depends on Cl. 6* ) |
| Cls. 66, 68–70 of '381 Patent (*depend on Cl. 65* ) | Cl. 12 of '303 Patent (*depends on Cl. 6* ) |

#### a. Collaterally Estopped Claims

 The feature differentiating claims 24 of the '303 Patent and 64 of the '018 Patent from invalid claims 47 and 60 of the '018 Patent, respectively, is a width-related limitation (*i.e.,* making a piece of metal narrower) intended to increase stent flexibility. However, as set forth in detail below, Guidant demonstrates that including this element in claims 24 and 64 does not distinguish the claimed combinations as a whole from the prior art. Specifically, Guidant establishes that the prior art discloses a motivation to combine the width limitation with other stent elements to achieve greater flexibility. Accordingly, claim 24 is substantially identical to invalid

---

**103.** Pl. Opp. at 16; *see also id.* at 13 (making similar argument regarding the Lau '955 Patent).

**104.** Def. Mem. at 13.

**105.** *See* Guidant's Claim Comparison.

claim 47 and claim 64 is substantially identical to invalid claim 60 and collateral estoppel bars the assertion of these claims.

### i. Claim 24 of the '303 Patent

The only difference between claims 24 and 47 [106] is the width limitation disclosed in claim 24: [107] "a portion of said flexible member [connector] having a width smaller than the width of said apices to which said first end and second end are connected." [108] Medinol contends that it is not precluded from litigating claim 24 because none of the claims found invalid in *Cordis* contained a "limitation regarding the width of the members of the claimed device, and width was not an allegedly distinguishing feature of the accused device." [109] But the question is not whether width was adjudicated in *Cordis*, but whether it lends patentable significance to the claimed combination, thereby altering the issues bearing on the obviousness determination. [110]

Guidant demonstrates that the width limitation does not present a triable issue because it is contained in the prior art—specifically in the drawings and text of the Palmaz '417 and Wolff '404 patents. For instance, Figure 9 of the Palmaz '417 and Figure 5 of the Wolff '404 Patent depict connectors that are narrower than the surrounding stent segments. Additionally, the Palmaz '417 Patent states that "it should be readily apparent to one of ordinary skill in the art, that the thickness of connector members 100 could alternatively be smaller than that of elongate members 75." [111]

Even though this additional limitation is clearly disclosed in the prior art, Medinol contends that "new limitation [is] significant to the goals of the patent[ ] and provide[s] advantages over the prior art," [112] namely that it makes the stent more flexi-

---

**106.** Claim 47, which "emphasizes the flexibility of the stent," Brief of Plaintiff–Appellant Medinol Ltd. at B0756, discloses:
A generally longitudinally extending tubular stent which is substantially uniformly flexible with respect to its longitudinal axis by the flexibility of its cells with respect to said axis including:
(a) a plurality of cells flexible around said longitudinal axis connected to one another about the circumference of said stent to form a band of flexible cells, each of said flexible cells having apices disposed apart and generally opposite to one another,
(b) each of said flexible cells having a plurality of flexible links disposed apart and generally opposite to one another,
(c) each of said flexible links including a plurality of portions with neighboring portions having an area of inflection there between, and
(d) said flexible cells in said adjacent bands of flexible cells connected to one another.

**107.** *See, e.g.,* Guidant's Claim Comparison at 1; Pl. Opp. at 20.

**108.** Def. Mem. at 13.

**109.** Pl. Opp. at 20.

**110.** *See Bourns,* 537 F.2d at 490. As Guidant points out, one of the new features discussed in *Bourns*—hollow rivets—was not mentioned in the lower court's decision. *See* 4/27/04 Letter to the Court from Guidant's counsel at 3. In that case, the operative question was whether "the newly claimed combination was nonobvious simply because of the addition of hollow rivets," which the *Bourns* court answered in the negative. *Id.* Accordingly, the court found that the addition of hollow rivets did not distinguish the combination as a whole from the prior art, and as such that the patentee could not relitigate the obviousness of the invention as a whole. *See Bourns,* 537 F.2d at 494.

**111.** Palmaz '417 Patent, col. 11, line 68–col. 12, line 3; *see also* Pl. 56.1 Stmt. ¶ 38.

**112.** 4/19 Pl. Ltr. at 5.

ble, and as such, the claimed combination as a whole is distinguishable from the prior art.[113] This argument fails, however, because Guidant has clearly demonstrated that the prior art discloses a motivation to combine this element into the stent to achieve the objective cited by Medinol—greater flexibility. For instance, the Wolff '404 Patent recites a motivation to combine this limitation with other prior art references to enhance flexibility, stating that the wire is "usually ground to a smaller diameter in the spaces between the stents to provide additional flexibility for the hinge function."[114] Thus, the additional element—relating to width—does not distinguish the claimed combination from the prior art and as such, does not present a triable issue. Accordingly, Medinol is collaterally estopped from asserting this claim.

### ii. Claim 64 of the '018 Patent

As for claim 64, Guidant compares it to claim 60 of the '018 Patent.[115] Comparison of these claims reveals one difference—claim 64 contains a width-related limitation. But, as noted above, this element does not distinguish the claimed combination as a whole from the prior art. Thus, collateral estoppel bars claim 64.

### b. Claims That Are Not Barred by Collateral Estoppel [116]

■ The remaining claims—28 of the '303 Patent; 51 of the '018 Patent; 28 of the '120 Patent; and 56–58, 61, 63, 65–66, and 68–70 of the '381 Patent are not barred by collateral estoppel. I reach this conclusion for the following reason: Guidant has not yet established that the additional features contained in these claims do not impart patentable significance to the combinations as a whole. As such, Guidant has not demonstrated that these claims are "substantially identical" to the claims litigated in *Cordis*.[117]

### i. Claim 28 of the '303 Patent

Guidant compares claim 28 with invalid

---

113. *See id.;* Tr. at 60.

114. Wolff '404 Patent, col. 2, lines 54–57.

115. Claim 60 provides:
A stent having a longitudinal axis formed of a tube having a patterned shape, the patterned shape comprising:
a. first meander patterns having axes extending in a first direction;
b. second meander patterns having axes extending in a second direction, different than said first direction, wherein said second meander patterns intersect with said first meander patterns;
c. wherein said first meander patterns have loops;
d. wherein said first meander patterns are spaced apart to leave a portion of said second meander patterns between each pair of adjacent first meander patterns;
e. wherein each of said second meander patterns has at least one loop between at least one pair of adjacent first meander patterns, and

f. wherein said loops disposed on said first meander patterns and said loops disposed on said second meander patterns are disposed and adapted to cooperate so that upon the expansion of said stent said loops change shape to compensate for the tendency of said stent to foreshorten when said stent is expanded.

116. In addition to the claims discussed in this section, as discussed in the preceding section, claims 13, 16, 18, and 27 of the '120 Patent and claims 1, 2–15, and 17 of the '982 Patent are also not collaterally estopped. *See supra* Part III.

117. Of course, Guidant's failure to demonstrate that these newly asserted claims are substantially identical to the previously litigated claims only prevents it from prevailing on *collateral estoppel* grounds. Guidant may ultimately establish that these claims are invalid for obviousness.

claim 47.[118] Medinol argues that there is a significant difference between the claims—namely that claim 28 "require[s] that the stent or a part thereof be composed of longitudinally adjacent bands of one type of cell."[119] That is, while claim 28 describes "connected cells having a longitudinal axis defining a substantially uniform structure of flexible cells having a longitudinal axis and a circumferential axis," claim 47 does not mention uniformity, disclosing only a stent that includes "a plurality of [flexible] cells."[120] Guidant has established that this feature is contained in the prior art. Specifically, Figure 5 of the Lau '955 Patent describes enclosed spaces of substantially the same size.[121]

Despite this, Medinol argues that the combination of this limitation ("longitudinal adjacent bands of one type of cell") with the other elements of the claim "increase substantially the flexibility of [the] stent"[122] in a manner that is not present in the prior art. Guidant has not yet sufficiently shown that this combination as a whole was known in the prior art or that the prior art discloses a clear motivation to combine these elements in this manner.[123] Therefore, Guidant has not demonstrated that the addition of uniformity does not lend patentable significance to the claimed

combination. Because claim 28 is not substantially identical to invalid claim 47, the claim is not barred by collateral estoppel.

### ii. Claim 51 of the '018 Patent

Guidant next compares claim 51 of the '018 Patent with invalid claim 47 of the '018 Patent, revealing that claim 51 contains two "new" limitations. *First,* claim 51 contains the following language: "whereby the flexible link can change shape to allow the distance between the attachment points [of the flexible link] to become longer or shorter to facilitate bending of the stent."[124] But, as Guidant notes, this concept is disclosed in invalid claim 12 of the '303 Patent and is therefore obvious. *Second,* claim 51 states: "(c) wherein each of said flexible links comprises a first attachment point and a second attachment point, the first and second attachment points being on a line segment that extends substantially parallel to said longitudinal axis prior to expansion of the stent."[125] Again, Guidant argues that this is not "new" because the Delaware court "construed the flexible link limitation of claim 47 to include the requirement that these elements be longitudinally or horizontally aligned."[126]

---

118. *See* Def. Mem. at 14. Guidant asserts that claim 28 "specifies that the flexible links are disposed apart and generally opposite to one another *about the circumferential extension of the cell,* whereas claim 47 only requires that flexible links be disposed apart and generally opposite to one another." *Id.*

119. Pl. Opp. at 22.

120. '303 Patent, col. 10, lines 16–19; '018 Patent, col. 12, line 28.

121. *See* Def. Reply at 8; Pl. 56.1 Stmt. ¶ 113.

122. Tr. at 60 (Hummel statement).

123. It bears noting again, *see supra* note 117 (same), that although Guidant has not adequately demonstrated that this claim is sub-

stantially identical to invalid claim 47, Guidant may ultimately establish that claim 28 is invalid for obviousness. That is, nothing in this decision forecloses Guidant from successfully moving for summary judgment *on the merits,* at a later stage in the proceedings. This reasoning applies with equal force to all of the claims discussed herein, which are not barred by collateral estoppel.

124. Def. Mem. at 15.

125. *Id.*

126. *Id.* (citing B0933). In the *Cordis* proceedings, Medinol objected to this claim construction, but the court rejected Medinol's arguments.

Medinol does not dispute Guidant's interpretation, but asserts that claim 51, like claim 28 of the '303 Patent, requires that the stent "consist[ ] essentially of" the described cells.[127] In other words, claim 51 requires adjacent bands of one type of cell, which, as discussed in the preceding section is disclosed in the prior art. However, as with claim 28, Medinol argues that the combination of this feature with the other elements of the claim increase stent flexibility in a novel manner.[128] Guidant has not adequately shown that the claimed combination is disclosed in the prior art or that the addition of this limitation is insignificant to the overall combination. Accordingly, claim 51 is not substantially identical to invalid claim 47 and collateral estoppel does not apply.

### iii. Claim 28 of the '120 Patent

Claim 28 depends on claim 21 of the '120 Patent, and differs from invalid claim 60 in one way—the requirement that the first and second meander patterns share common members. Guidant argues that this limitation is disclosed in the Lau '955 Patent, "because the rings are serpentine and there are loops of the rings between adjacent connectors."[129] Medinol counters that "Guidant has made no showing that there was a motivation to combine [the Lau '955 Patent] with any of the claims held invalid or with any other reference."[130] Guidant has not sufficiently demonstrated that this combination as a whole is contained in the prior art or that this additional element does not lend patentable significance to the invention. Accordingly, claim 28 is not substantially identical to invalid claim 60, and Medinol is not precluded from asserting claim 28 in this action.

### iv. Claims 56–58, 61, 63, 65–66, and 68–70 of the '381 Patent

The remaining claims are comparable to invalid claim 12 of the '303 Patent, which is dependent on claim 6 of the same patent.[131] Guidant first argues that claim 56 and its

---

127. Pl. Opp. at 22 (quoting '018 Patent, col. 13, line 6).

128. Tr. at 60 (Hummel statement).

129. Def. Mem. at 17.

130. Pl. Opp. at 24.

131. These claims provide:

12. The stent of claim 6, wherein said cells define a uniform cellular structure.

6. An expandable stent defining a longitudinal aperture, including: a plurality of flexible connected cells, each of said flexible cells comprising:

a) a first member having a longitudinal component having a first end and a second end;

b) a second member having a longitudinal component having a first end and a second end,

c) a third member having a longitudinal component having a first end and a second end;

d) a fourth member having a longitudinal component having a first end and a second end;

e) a first loop defining a first angle disposed between said first end of said first member and said first end of said second member;

f) a second loop defining a second angle disposed between said second end of said third member and second end of said fourth member, and disposed generally opposite to said first loop;

g) a first flexible compensating member or flexible link having a first end and a second end disposed between said first member and said third member, said first end of said first flexible compensating member or flexible link communicating with said second end of said first member and said second end of said first flexible compensating member or flexible link communicating with said first end of said third member, said first and said second ends disposed a variable longitudinal distance from each other;

h) a second flexible compensating member or flexible link having a first end and a second end disposed between said second member and said fourth member,

invalid counterpart—claim 12—are substantially identical in that they both describe a stent including a plurality of flexible connected cells. The elements of these cells are described using slightly different terminology—*i.e.*, claim 56 provides for a "first circumferential member disposed between said first longitudinal end of said first flexible link and said first longitudinal end of said second flexible link"[132] whereas invalid claim 12 provides for "a first member having a longitudinal component having a first end and a second end; a second member having a longitudinal component having a first end and a second end . . . . [and] a first loop defining a first angle disposed between said first end of said first member and said first end of said second member."[133] Even though the words differ, they describe essentially the same structure, which is disposed between two flexible links and consists of a loop between members.

But claim 56 also contains a new limitation, section (e), as compared with invalid

claim 12, which discloses a limitation requiring circumferential members:

> having a portion with a substantial longitudinal component that is also a portion with a substantial longitudinal component of a first circumferential member or a second circumferential member in a longitudinally adjacent cell, wherein in the expanded state the first and second circumferential members have a substantial longitudinal component to provide coverage of the lumen.[134]

Guidant claims that this difference is obvious because it is present in the prior art. In particular, Guidant points out that this feature is revealed in Figure 3 of the Lau '955 Patent, which is "specifically described as being in the expanded state" and depicts "circumferential members (the rings) [with] a longitudinal component that is shared with adjacent cells."[135] The Lau '955 Patent also describes coverage of the lumen, stating that the "closely spaced cylindrical sections 12 provide uniform

> said first end of said second flexible compensating member or flexible link communicating with said second end of said second member and said second end of said second flexible compensating member or flexible link communicating with said first end of said fourth member, said first and said second ends disposed a variable longitudinal distance from each other, said first and said second flexible compensating member or flexible links differentially extendable or compressible when said stent is bent in a curved direction away from the longitudinal axis of said aperture; and
>
> i) said first, said second, said third, and said fourth members and said first and said second loops, and said first and said second flexible compensating member or flexible links disposed so that as said stent is expanded the distance between said first and said second flexible compensating member or flexible links increases and the longitudinal component of said first, second, third and fourth members decreases while said first and

> said second loops remain generally opposite to one another, the ends of said first and said second flexible compensating member or flexible links open so as to increase said variable longitudinal distance between said first and said second ends of said first flexible compensating member or flexible link and so as to increase said variable longitudinal distance between said first and said second ends of said second flexible compensating member or flexible link so as to compensate for the decreasing of the longitudinal component of said first, second, third, and fourth members and substantially lessen the foreshortening of said stent upon its expansion.

132. '381 Patent, col. 10, lines 1–4.

133. '303 Patent, col. 7, lines 5–8, 13–15.

134. '381 Patent, col. 10, lines 11–18.

135. Def. Mem. at 21; Pl. 56.1 Stmt. ¶ 75.

support for the wall of the artery 15." [136]

Even though this new limitation is present in the prior art, Medinol again contends that the combination of this feature with the other elements of the claim "help[ ] make the stent more uniformly flexible along the longitudinal axis" [137] in a way that distinguishes the combination as a whole from the prior art. Guidant, in turn, has not yet shown that this additional limitation is of no importance to the combination as a whole and accordingly this feature does not lend patentable significance to the claim. As such, claim 56 is not substantially identical to invalid claim 12, precluding the application of collateral estoppel. Because claims 57, 58, 61, and 63 depend on claim 56, they similarly survive this motion.

Claim 65 describes a structure similar in many ways to that revealed by claim 56 and comparable to invalid claim 12. A new limitation is presented by claim 65 by the language "wherein said plurality of connected flexible cells imparts radial strength to said stent and coverage of the surface of said lumen in an amount sufficient to support said lumen when said stent is expanded by a balloon from a delivery diameter to a deployment diameter." This difference, however, is disclosed by the Lau '955 patent, which describes the expansion of the stent in the artery through the inflation of a balloon, thereby causing the cylindrical elements of the stent to be pressed into the wall of the artery providing "uniform support for the wall of the artery." [138] As with claim 56, Medinol asserts that this limitation, com-

bined with the other features of this claim, serve to make the stent more uniformly flexible along the longitudinal axis, thus distinguishing the combination as a whole from the prior art. Again, Guidant makes no adequate contrary showing and as such, Medinol is not precluded from asserting this claim, along with all claims dependent on it, *i.e.*, claims 66 and 68–70.

## IV. CONCLUSION

For the foregoing reasons, Guidant's motion for summary judgment on the basis of collateral estoppel is granted as to the following claims: 24 of the '303 Patent and 64 of the '018 Patent. Guidant's motion is denied as to the following claims: 28 of the '303 Patent; 13, 16, 18, and 27, and 28 of the '120 Patent; 51 of the '018 Patent; 1, 2–15, and 17 of the '982 Patent; and 56–58, 61, 63, 65–66, and 68–70 of the '381 Patent. The Clerk of the Court is directed to close this motion [# 25 on the docket sheet]. A conference is scheduled for June 14, 2004, at 4:30 p.m. in Courtroom 15C.

SO ORDERED.

---

**136.** Lau '955 Patent, col. 5, lines 22–23.

**137.** Tr. at 60 (Hummel statement).

**138.** Lau '955 Patent, col. 5, lines 23–24; *see also id.* col. 4, line 53–col. 5, line 6.